**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GUY HAYMON,

        *Plaintiff*,

    v.

DISTRICT OF COLUMBIA, *et al.*,

        *Defendants*.

Civil Action No. 21-886 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Under District of Columbia law, the Mayor may appoint special police officers ("SPOs") "in connection with the property of, or under the charge of, [any] corporation or individual," provided that the SPOs are "paid wholly by the corporation or person on whose account their appointments are made." D.C. Code § 5-129.02. The Mayor, in turn, has delegated that authority to the Metropolitan Police Department ("MPD"). *See* Mayor's Order 2008-81, ¶ F.4 (June 5, 2008). Plaintiff Guy Haymon used to work as an SPO for Washington Field Protective Services, a private security agency in the District of Columbia. On May 19, 2019, Haymon was on duty at a Safeway in Southeast Washington, D.C., when a gunman opened fire in the parking lot. Haymon returned fire and the gunman fled the scene. No one was injured during the exchange of gunfire. That same day, the MPD investigated the incident and determined, among other things, that Haymon's SPO commission did not authorize him to carry a firearm while on duty. The MPD subsequently revoked Haymon's SPO commission, citing Haymon's "unlawful discharge of [a] firearm" as justification. The MPD never explained its decision to Haymon and never provided him an opportunity to dispute it. Without the commission, Haymon can no

longer serve as an SPO, and he was terminated from his position with Washington Field Protective Services.

Haymon brings this action against Defendants the District of Columbia and Jeffrey McGunigal, an employee of the MPD's Security Officer's Management Branch ("SOMB"), which oversees the issuance and revocation of SPO commissions. Haymon alleges that Defendants violated his due process rights under the Fifth Amendment by revoking his SPO commission without notice or an opportunity to dispute the revocation. He also asserts a common law claim for tortious interference with prospective business advantage. Defendants, in response, move to dismiss the complaint for failure to state a claim. Dkt. 10.

For the reasons stated below, the Court will **GRANT** in part and **DENY** in part Defendants' motion.

## I. BACKGROUND

For purposes of resolving the pending motion to dismiss, the Court accepts the following factual allegations as true. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Haymon is a resident of the District of Columbia, where he previously worked as an SPO for Washington Field Protective Services. Dkt. 1-2 at 3–4 (Compl. ¶¶ 3, 6); *see also* Dkt. 10 at 7–8. An SPO is a "privately employed" security officer who, pursuant to a commission issued by the Mayor, is vested with "the same power of arrest . . . as a Metropolitan Police Officer." *United States v. Lima*, 424 A.2d 113, 119 (D.C. 1980); *see also United States v. McDougald*, 350 A.2d 375, 378 (D.C. 1976) ("The power of arrest of a[n] [SPO] is the sole factor which distinguishes the holder of a special police commission from a private citizen."). Under D.C. law, no person shall be commissioned as an SPO unless he satisfies several eligibility and training requirements, including "all . . . initial and re-qualification training standards for

2

firearms and other equipment, as applicable." D.C. Mun. Regs. tit. 6-A, § 1100.7(h). To obtain his SPO commission, Haymon "complied with all preliminary requirements allowing him to carry a firearm," including "completion of the Armed Special Police Officers Firearms Course," for which he received an "SOMB Certificate." Dkt. 1-2 at 4 (Compl. ¶ 7). According to Haymon, the certificate "affirmed that [he] was authorized to bear firearms pursuant to having 'successfully completed the Firearms Certification Course requirements.'" *Id.* Moreover, his SPO commission "contained no restriction prohibiting him from carrying a firearm while on duty." *Id.* (Compl. ¶ 8). Haymon clarified in a subsequent filing, however, that he merely contends that "his SPO [commission] did not indicate whether it was for armed or unarmed" activity. Dkt. 22 at 2.

On May 19, 2019, Haymon was working on assignment at a Safeway in Washington, D.C. Dkt. 1-2 at 4 (Compl. ¶ 9). According to Haymon, "[s]uddenly, [and] without warning, shooting erupted in the parking lot." *Id.* (Compl. ¶ 10). The shooter appeared to be targeting a woman. *Id.* "[I]n an effort to protect the woman, other shoppers, and himself," Haymon "returned fire." *Id.* at 4–5 (Compl. ¶ 11). Haymon alleges that, "[a]s a result of [his] prompt, resolute and heroic efforts," the shooter fled and no one was injured. *Id.* at 5 (Compl. ¶ 12).

That same day, the MPD performed a "routine investigation" of Haymon's conduct during the incident. *Id.* (Compl. ¶ 13). According to Haymon, the investigation "acknowledged that [he] had acted properly" by discharging his firearm under the circumstances. *Id.* But despite that conclusion, Defendant McGunigal—who was the Senior Sergeant for the SOMB, *id.* at 3 (Compl. ¶ 5)—allegedly "harbored unjustified reservations regarding [Haymon's] clear, defensive use of his firearm in the line of duty," *id.* at 5 (Compl. ¶ 14). As a result, McGunigal summarily revoked Haymon's SPO commission that very same day "without notice or

3

justification." *Id.* (Compl. ¶ 15).  Although the document memorializing the revocation stated that "there had been an 'unlawful discharge of [a] firearm,'" no one explained to Haymon "why the discharge was allegedly 'unlawful'" or gave him "notice or any opportunity to appeal, clear his name, or address the revocation." *Id.* (Compl. ¶ 16).  To date, the MPD has failed to issue any "findings, report, or . . . determinations . . . regarding the status of [Haymon's] . . . revocation," *id.,* or to send Haymon any communication relating to the revocation.  *Id.* at 6 (Compl. ¶ 19).  Without his commission, Haymon alleges that he "has been unable to earn a livelihood and [to] pursue his career as a[n] [SPO]."  *Id.* at 5–6 (Compl. ¶ 18).

On February 24, 2021, Haymon filed this lawsuit in Superior Court, naming as Defendants the District of Columbia and McGunigal.  Dkt. 1-2 at 2.  In his complaint, Haymon asserts three claims.  The first two claims allege that Defendants violated Haymon's due process rights in violation of the Fifth Amendment and 42 U.S.C. § 1983.  *Id.* at 6–10 (Compl. ¶¶ 20–45) (Counts I & II).  The third claim alleges that Defendants tortiously interfered with Haymon's prospective business advantage under D.C. law.  *Id.* at 12–13 (Compl. ¶¶ 46–61) (Count III).  Haymon seeks compensatory and punitive damages, injunctive relief, and attorney's fees.  *Id.* (Compl.).

On April 1, 2021, the District timely removed the case to this Court, Dkt. 1, and, on May 13, 2021, Defendants filed a motion to dismiss for failure to state a claim, Dkt. 10.  Attached to Defendants' motion is a one-page exhibit that they refer to as Haymon's "SPO Commission Application Approval, dated Nov. 28, 2018."  *Id.* at 8.  That document, Dkt. 10-3 at 2, which is reproduced in an appendix to this opinion, is titled "Application Approval" and bears the logos of the D.C. Department of Consumer and Regulatory Affairs, the MPD, and the SOMB.  *Id.* Among other things, the approval form provides the following information: "Date Reviewed:

10/22/2018;" "Name of Individual: Guy Haymon;" and, at the bottom, "Date: 11/28/18." *Id.*
The form also provides boxes that the "reviewing officer" can check to indicate the "Application
Type;" "Documents Required;" "Designations;" and whether the applicant's "Criminal History
Review" was "Approved" or "Disapproved." *Id.*  Several boxes are checked, but two boxes
appear as though they may have been checked initially and then erased: (1) a box indicating that
that the required documentation included a "Range Certification," and (2) a box indicating that
Haymon received a "Designation[]" for "SPO Armed." *Id.*  Under the heading "Criminal
History Review," the approval form indicates that Haymon was "approved." *Id.*  Immediately
below that designation, however, the form provides a space for the reviewing official to "list
deficiency" "[i]f disapproved." *Id.*  In that space, it says in handwritten text: "<u>UNARMED</u> SPO
ONLY." *Id.*

   After Defendants filed their motion to dismiss, Haymon initially disputed the authenticity
of the approval form exhibit.  In his opposition to Defendants' motion to dismiss, Haymon
"contest[ed] the authenticity and reliability of Defendants Ex. No. 3 (Application Approval)"
because "it appear[ed] to indicate that it ha[d] been altered."  Dkt. 12 at 23 n.13.  In addition,
Haymon filed a motion to strike the exhibit on the ground that "it appear[ed] to have been altered
and[,] as a result, the authenticity of [the document] appears to be disputed."  Dkt. 15 at 1.  In
opposing Plaintiff's motion to strike, Defendants provided the Court with several additional
exhibits corroborating Defendants' contention that Haymon was approved as an "<u>UNARMED</u>
SPO ONLY."  Dkt. 17-1 at 6.  Those exhibits included an email dated December 5, 2018, from
an SOMB official to "Plaintiff's employer, Ronald Gaines," Dkt. 17 at 7, which states: "FYI, it
took a lot, but I was able to get Mr. Haymon an[] **<u>unarmed</u>** SPO license," Dkt. 17-1 at 12.

After reviewing these materials, Haymon withdrew his motion to strike.  Dkt. 20 at 1.

According to Haymon, "what was anticipated as a simple motion regarding the legal clarity and

applicability of the subject documents to Defendants' [m]otion to [d]ismiss has become distorted

and has morphed into a distraction."  *Id*.  Haymon urged, moreover, that "a just and fair

adjudication of the case at this juncture would require, at [a] minimum, allowance of basic

discovery."  *Id.* at 2.

The Court then held a hearing on the motion to dismiss to determine whether, in light of

the parties' dispute over the authenticity of the approval form and Plaintiff's request for

discovery, the motion should be converted to a motion for summary judgment.  *See* Minute Entry

(May 5, 2022).  At the conclusion of the hearing, the Court ordered Plaintiff's counsel to file a

status report advising the Court of "(1) Any dispute [as] to the authenticity of [the alleged

application approval] in Defendants' Motion to Dismiss; (2) Putting aside authenticity, any

dispute [as to] whether the approval was for an unarmed SPO; [and] (3) If that proposition is

disputed, indicate what discovery will be taken and on what schedule."  *Id.*

Haymon responded to the Court's order on May 17, 2022.  With respect to the

authenticity of the approval form, Haymon represented that, "notwithstanding apparent changes

in said Exhibit, Plaintiff cannot definitely establish that this was not the final document.

Accordingly, the authenticity will not be disputed."  Dkt. 22 at 1.  With respect to whether

Haymon was, in fact, approved for an unarmed SPO commission only, Haymon averred: "again,

Plaintiff is without evidence to establish that the approval was for an armed SPO license.

Accordingly, this issue will not be disputed."  *Id.*  In a footnote, Haymon asserted that he "was

subject to some confusion in light of the fact that his SPO license did not indicate whether it was

for armed or unarmed license, something the [SOMB] was obligated to do.  See Metropolitan

Police Department General Order 308.7 (Private Security), p. 3." *Id.* n.1.  Finally, with respect

to discovery, Haymon noted that, in light of "the foregoing, there will be no need for discovery

on the above mentioned issues." *Id.* at 1.  Plaintiff went on to assert, however, that

"notwithstanding [these] concessions, he maintains that the Counts in the Complaint are still

viable and meritorious and will be pursued." *Id.* at 1–2.

Given this history, the Court will consider the SPO Application Approval, which

indicates that Defendant was approved for an "<u>UNARMED</u> SPO ONLY," on the ground that the

authenticity of this document is no longer in dispute.

## II.  LEGAL STANDARD

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a complaint." *Browning v.

Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  A claim is plausible if "the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  Although "detailed factual allegations" are not required, the complaint must contain "more

than an unadorned, the-defendant-unlawfully-harmed-me allegation." *Id.* (quoting *Twombl*y,

550 U.S. at 555).  In assessing a Rule 12(b)(6) motion, a court may generally consider only "the

facts contained within the four corners of the complaint." *Nat'l Postal Prof'l Nurses v. U.S.

Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006).  A court may also consider "documents

attached to a motion to dismiss . . . if those documents' authenticity is not disputed, they were

referenced in the complaint, and they are 'integral' to one or more of the plaintiff's claims."

*Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 105 (D.D.C. 2017).

# III.  ANALYSIS

## A.  Due Process Claims (Counts I and II)

To succeed on a procedural due process claim, Haymon must first identify a deprivation of a protected interest in "life, liberty, or property." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting U.S. Const. amend. V).  If Haymon establishes that he was deprived of a protected interest, the Court must then determine "whether the procedures used by the Government in effecting the deprivation 'comport[ed] with Due Process.'"  *Id.* (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).

Haymon's complaint asserts two procedural due process claims.  First, he alleges that he held a protected property interest in his SPO commission and that Defendants unlawfully revoked his commission without affording him "basic due rights," namely (1) "a prior notice of the revocation of his SPO commission;" (2) "a pre-deprivation hearing;" (3) "a post-deprivation hearing;" (4) "a right to an appeal;" or (5) "any adequate post-deprivation remedy."  Dkt. 1-2 at 6–8 (Compl. ¶¶ 20–31).  Second, he alleges that Defendants infringed a protected liberty interest because their sole explanation for revoking his SPO commission was a "conclusory and defamatory allegation that [he] 'unlawfully discharged his firearm,'" and, as a result of the revocation, his "basic and fundamental right to earn a livelihood as an SPO has been wrongfully precluded."  *Id.* at 9–10 (Compl. ¶¶ 37, 42).  Defendants contend that both claims are meritless. The Court will address each claim in turn.

### 1.  *Property Interest*

To establish the existence of a property interest in a benefit, a plaintiff must show "more than an abstract need or desire for it;" he must have a "legitimate claim of entitlement to it," created by "existing rules or understandings that stem from an independent source such as state

law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Haymon alleges that he had a "well-established property . . . interest[] in retaining his District of Columbia issued SPO license."  Dkt. 1-2 at 6 (Compl. ¶ 24).

Defendants argue that Haymon had no property interest in his SPO commission because, in their view, D.C. law vests the Mayor with "unfettered discretion to issue SPO commissions," Dkt. 10 at 12, and "[i]t is well settled that '[w]hen a statute leaves a benefit to the discretion of a government official, no protected property interest can arise,'" *id.* at 11 (quoting *Roth v. King*, 449 F.3d 1272, 1285 (D.C. Cir. 2006)).  By highlighting only the Mayor's discretion to issue SPO commissions, however, Defendants fail to recognize the "critical distinction" between "those cases [in which] the question [is] whether an *applicant* for a [benefit] had a property interest therein" and those cases where "the *holder* of a [benefit alleges] a property interest therein."  *3883 Conn. LLC v. District of Columbia,* 336 F.3d 1068, 1072 (D.C. Cir. 2003).  This case falls in the latter category: Haymon sought and was granted an SPO commission; he "relied upon" that commission "for his employment and livelihood," Dkt. 1-2 at 9 (Compl. ¶ 35); and he now challenges the District's decision to revoke the commission without warning or an opportunity to be heard, thereby jeopardizing his employment.  Whether the Mayor has discretion to decide whether to grant SPO commissions in the first instance is thus beside the point.  The Court's task, instead, is to determine whether Haymon "ha[d] 'more than a unilateral expectation' in the [commission's] continued effect."  *3883 Conn. LLC*, 336 F.3d at 1072.  That inquiry, in turn, "focuses on the [government's] discretion to revoke" the commission under state law.  *Id.*

To determine the extent of the District's discretion to revoke or suspend an SPO commission, the Court need look no further than D.C. Code § 5-127.01, which governs the

Mayor's powers to remove Metropolitan Police Officers.  Section 5-127.01 provides, in relevant

part:

> [The] Mayor is hereby authorized and empowered to fine, suspend with or
> without pay, and dismiss any officer or member of [the Metropolitan Police]
> force for any offense against the laws of the United States or the laws and
> ordinances or regulations of the District of Columbia, whether before or after
> conviction thereof in any court or courts, and for misconduct in office, or for any
> breaches or violation of the rules and regulations made by the Council for the
> government, conduct, discipline, and good name of said police force; provided,
> that no person shall be removed from said police force except upon written
> charges preferred against him in the name of the Chief of Police of said police
> force to the trial board or boards hereinafter provided for and after an
> opportunity shall have been afforded him of being heard in his defense; but no
> person so removed shall be reappointed to any office in said police force;
> *provided further, that special policemen and additional privates may be
> removed from office by the Mayor without cause and without trial*; provided
> further, that charges preferred against any member of said police force to the
> trial board or boards hereinafter provided for may be altered or amended, in the
> discretion of such trial board or boards, at any time before final action by such
> board or boards, under such regulations as the Council may adopt, provided the
> accused have an opportunity to be heard thereon.

D.C. Code § 5-127.01 (emphasis added).[1]  The statute, accordingly, provides substantial removal

protections for MPD officers while carving out an exception for "special policemen:" the latter

may be "removed from office by the Mayor without cause and without trial."  *Id.*  To be sure,

Section 5-127.01 refers to "special policemen," while the statute authorizing the appointment of

SPOs refers to "special police officers," D.C. Code § 5-129.02.  But an examination of the

history of the two statutes, Sections 5-127.01 and 5-129.02, dispels any suggestion that Section

5-127.01 is inapplicable to SPOs.  When it was first enacted in 1899, Section 5-129.02 originally

---

[1] In 1978, the Council of the District of Columbia enacted a law providing that Section 5-127.01
"shall not apply to police officers and firefighters appointed" after January 1, 1980.  *See* D.C.
Code §§ 1-632.03(a)(1)(Z), 1-632.02(m)(1).  To the extent the Council partially repealed Section
5-127.01 with respect to "police officers," it did not do so with respect to SPOs, who are treated
separately.  *Cf. Griffith v. Lanier*, 521 F.3d 398, 402 (D.C. Cir. 2008) (construing Section 5-
127.01's reference to "officer[s] or member[s] of [the] police force" as excluding members of the
Metropolitan Police Department Reserve Corps).

authorized the appointment of "special policemen."  Act of Mar. 3, 1899, 30 Stat. 1057, ch. 422.[2]

The statute then referred to "special policemen" for over 100 years until the D.C. Council

amended the law in 2006 to refer to "Special Police Officers."  *See* 53 D.C. Reg. 6722 (Nov. 16,

2006).  Meanwhile, the clause in Section 5-127.01 that authorizes the removal of "special

policemen . . . without cause and without trial" became law in 1906 and has not been amended

since.  *See* Act of June 8, 1906, 34 Stat. 222, ch. 3056.  Based on this statutory history, it is

evident that Section 5-127.01's reference to "special policemen" includes SPOs and that the

provision grants the Mayor discretion to revoke an SPO commission with or without cause.

The D.C. Circuit's opinion in *Griffith v. Lanier*, 521 F.3d 398 (D.C. Cir. 2008), supports

this reading of Section 5-127.01.  In *Griffith*, two members of the D.C. Metropolitan Police

Department Reserve Corps—a "corps of unpaid volunteers who assist full-time officers of [the

MPD] in the provision of law enforcement services"—challenged an order issued by the Chief of

Police that authorized the at-will dismissal of Reserve Corps members.  *Id.* at 298.  The plaintiffs

argued that the order threatened to deprive them of their due process rights because they had a

property interest in "continued volunteer service."  *Id.* at 300.  Stressing that "the success of [the

plaintiffs'] due process claim require[d] local legal protection of their interests in continued

service," the D.C. Circuit concluded that "because the plaintiffs' interests are unprotected by

D.C. law, the Due Process Clause offers them no help."  *Id.*

---

[2] The statute read: "[T]he Commissioners of the District of Columbia, on application of any
corporation or individual, or in their own discretion, may appoint special policemen for duty in
connection with the property of, or under the charge of, such corporation or individual; said
special policemen to be paid wholly by the corporation or person on whose account their
appointments are made, and to be subject to such general regulations as the said Commissioners
may prescribe."

In reaching that conclusion, the D.C. Circuit briefly considered the meaning of Section 5-127.01, including the provision relating to special policemen. The plaintiffs in *Griffith* asserted that because (1) the statute provides that "no person shall be removed from said police force" without cause, *id.*, and (2) "the plaintiffs [were] 'persons' within the terms of the statute," they "[could] not be removed from their volunteer positions except for cause," *id.* at 301. In response, the defendant argued that Section 5-127.01 excludes volunteer officers from for-cause removal protection because it provides that "special policemen and additional privates may be removed from office by the Mayor without cause and without trial." *Id.* (quoting D.C. Code § 5-127.01). According to the defendant, "because these exempted groups"—"special policemen and additional privates"—"were the only categories of volunteer police existing in 1906 [when the exemption was added to Section 5-127.01], the proviso currently applies to all existing categories of volunteer officers." *Id.* The D.C. Circuit was unpersuaded. *Id.* With respect to the exemption for special policemen, the court explained that "[b]oth in 1906 and today, . . . 'special policemen' were specifically defined as privately-employed security officers imbued with certain public powers." *Id.* (citing Act of Mar. 3, 1899, ch. 422, 30 Stat. 1045, 1057 (codified as amended at D.C. Code § 5-129.02)). Thus, Section 5-127.01's provision authorizing the at-will dismissal of "special policemen" did not cover modern-day Reserve Corps members such as the plaintiffs in *Griffith*. But, as the D.C. Circuit indicated, Section 5-127.01 does cover modern-day SPOS. To be sure, that aspect of the Griffith decision was *dicta*, but the D.C. Circuit's analysis of the statute is both convincing and consistent with the text and history discussed above.

Although the Court directed the parties to come prepared to discuss Section 5-127.01 at the hearing on Defendants' motion to dismiss, *see* Minute Order (May 2, 2022), Haymon's counsel offered no meaningful response to the Court's questions about whether Section 5-127.01

forecloses his claim to a property interest in his SPO commission.  Haymon, more generally, has failed to identify any provision of D.C. law to support such a claim.  Instead, he relies on the Supreme Court's opinion in *Bell v. Burson*, 402 U.S. 535 (1971), for the proposition that "it is well settled that a license once issued cannot be taken away without due process."  Dkt. 12 at 9 (footnote omitted).  In *Bell*, the plaintiff raised a due process challenge to a Georgia law that required the state to suspend the driver's license of anyone who was reportedly involved in a traffic accident, unless the person "furnished . . . security[] sufficient to satisfy any judgments for damages or injuries resulting" from the accident.  402 U.S. at 536 n.1 (quotation marks omitted).  The law included several exemptions to the suspension requirement, including in circumstances where, "prior to suspension," the injured party executed a "release from liability" or "there [was] an adjudication of nonliability."  *Id.* at 541.  The law also provided for a pre-suspension administrative hearing but "consideration of the motorist's fault or liability for the accident" was not permitted.  *Id.* at 536.

The plaintiff argued that the statutory scheme violated the due process clause by failing to provide him with a pre-suspension hearing "on the question of his fault or liability."  *Id.*  The Supreme Court agreed, holding that Georgia could not suspend a license "without that procedural due process required by the Fourteenth Amendment."  *Id.* at 539, 541.  In so holding, the Court observed that "[o]nce licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood."  *Id.* at 539.  The Court then went on to conclude that "[s]ince the statutory scheme makes liability an important factor in the State's determination to deprive an individual of his licenses, the State may not, consistently with due process, eliminate consideration of that factor in [a] prior hearing."  *Id.* at 541.  Haymon hones in on *Bell*'s observation that a driver's license, once issued, may become "essential in the pursuit of a

livelihood" and maintains that the same concern is "paramount in the case of a Special Police

Officer license" because an SPO "simply could not pursue his profession . . . without a license."

Dkt. 12 at 10.  Thus, in Haymon's view, *Bell* controls and the Court must hold that Haymon's

SPO commission was a constitutionally protected property interest.  For two reasons, the Court is

unpersuaded.

First, even assuming (counterfactually) that *Bell* held that all "licenses" constitute

property for due process purposes, the Court is unpersuaded that Haymon's SPO commission

was, in fact, a "license."  The word "license" appears nowhere in the D.C. statutory or regulatory

provisions that govern the appointment of SPOs.  Nor does Haymon provide any support for his

allegation that an SPO commission is a "license;" the complaint merely avers, without legal

support, that Haymon was an SPO pursuant to an "[SPO] commission (i.e. a license)," Dkt. 1-2

(Compl. ¶ 6), and his opposition brief simply states, again without support, that "Special Police

'license' is used interchangeably [in the brief] with Special Police 'commission.'"  Dkt. 12 at 9

n.5.  The Court need not accept those legal conclusions as true, even at this early stage of the

litigation.  *See Iqbal*, 556 U.S. at 678.  Without any supporting authority, the Court cannot

assume that an SPO commission is a "license."

And, indeed, there is good reason to doubt that an SPO commission is a license.  A

license is commonly understood to constitute "[a] privilege granted by a state or city upon the

payment of a fee, the recipient of the privilege then being authorized to do some act or series of

acts that would otherwise be impermissible," or "a method of government regulation exercised

under the police power, as with a license to drive a car, operate a taxi service, keep a dog in the

city, or sell crafts as a street vendor."  *License*, Black's Law Dictionary (11th ed. 2019).  By

contrast, under D.C. law, the Mayor is authorized to "appoint" SPOs, *see* D.C. Code § 5-129.02

14

("The Mayor, on application of any corporation or individual, or in his own discretion, may appoint special police officers . . ."); *see also* D.C. Mun. Regs. tit. 6-A, § 1100, and SPOs are subsequently issued "commissions," *id.*  Unlike a license, a commission "empowers the person named to execute *official* acts."  *Commission*, Black's Law Dictionary (11th ed. 2019) (emphasis added).  The holder of an SPO commission is empowered to make arrests on behalf of the state, *see Lima*, 424 A.2d at 119–20, and, when exercising that authority, she "act[s] as an agent[] or instrumentalit[y] of the state."  *Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1145 (D.C. 1991).  Thus, as discussed further below, approval of an SPO application is more akin to an appointment to a governmental office (of sorts) than to a grant of a privilege to operate in a regulated field.  That matters because, under *Roth*, a government official cannot make out a property interest due process claim without a "legitimate claim of entitlement" to her position, based on "existing rules or understandings that stem from an independent source such as state law."  *Roth*, 408 U.S. at 577.

Second, even assuming (again counterfactually) that Haymon's SPO commission was a license, the Court is unconvinced that *Bell* stands for the broad proposition that any state-issued license creates a constitutionally protected property interest.  To be sure, the Supreme Court recognized in *Bell* that a driver's license "may become essential in the pursuit of a livelihood." 402 U.S. at 539.  But that is just one sentence from the Court's analysis, and, in any event, as the Supreme Court observed almost thirty years after *Bell*, whether a license creates a constitutionally protected property interest is a context-dependent inquiry.  *See Cleveland v. United States*, 531 U.S. 12, 25 n.4 (2000) ("In *some contexts*, we have held that individuals have constitutionally protected property interest in state-issued licenses essential to pursuing an occupation or livelihood." (emphasis added) (citing *Bell*, 402 U.S. at 539)).

In the present context, the Court cannot conclude that an SPO commission confers a constitutionally protected property right on its holder. Unlike a driver's license, which confers a commonly exercised "right to operate a vehicle on the highways of the State," *Paul v. Davis*, 424 U.S. 693, 711 (1976), an SPO commission confers an extraordinary police power on those who are not subject to day-to-day supervision by the MPD—*i.e.*, the power to make arrests—and, as explained above, it does so with the express proviso that the Mayor may revoke those powers at will. The Court does not doubt that Haymon relied on his employment as an SPO and that his SPO commission aided him in his employment. But not every grant of state-sanctioned power creates a property right, and, here, D.C. law grants the Mayor unfettered discretion to revoke the unique police power granted to SPOs. That limitation on the receipt of an SPO commission is both lawful and sufficient to defeat Haymon's property interest-based due process claim.

The Court will, accordingly, dismiss Count I.

2.     *Liberty Interest*

Haymon also alleges that he was deprived of a protected liberty interest without due process. The D.C. Circuit recognizes liberty interest procedural due process claims under two distinct, albeit overlapping, legal theories. The first theory, known as "reputation-plus," requires a showing of "the conjunction of official defamation and adverse employment action." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). Although government defamation alone is not actionable under this theory, defamation in the course of an adverse employment action is actionable, at least at times. *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 710 (1976)). The second theory, known as "stigma-plus," requires "the combination of an adverse employment action and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'" *Id.* (quoting *Roth*, 408 U.S. at 573). A stigma-plus claim

16

differs from a reputation-plus claim in that the former "does not depend on official speech, but on a continuing stigma or disability arising from official action." *Id.*

Haymon's complaint relies on both theories. *See* Dkt. 1-2 at 8–10 (Compl. ¶¶ 32–45). He alleges that his SPO commission was revoked based on "[an] unfounded, conclusory and defamatory allegation that [he] 'unlawfully discharged his firearm.'" *Id.* at 9 (Compl. ¶ 37). He adds that he was "never arrested or criminally charged in connection with the defamatory SOMB allegation, but the professionally denigrating and reputation damaging accusation remained as a part of his record with the SOMB." *Id.* (Compl. ¶ 38). Haymon further alleges that the finding that he unlawfully discharged a firearm has "severely impugned and damaged his professional reputation, standing and associations in the special police community" and has "precluded [him] from . . . pursuing his career and employment as an SPO." *Id.* (Compl. ¶¶ 39–40); *see also id.* at 13 (Compl. ¶ 60) (alleging that Haymon lost his employment after his SPO commission was revoked). As a result, Haymon alleges, "[a] permanent roadblock continues to be placed in [the way of] Haymon's ability to practice his profession and pursue his career." *Id.* at 10 (Compl. ¶ 43).

As a threshold matter, Defendants argue that Haymon cannot state a liberty interest claim under either legal theory because he was not a government employee and thus did not suffer "the type of adverse employment action necessary to sustain a due process claim."[3] Dkt. 10 at 16. At first blush, this argument has some plausibility. Courts in this circuit routinely begin their analysis of liberty interest claims by referring to "loss of *government* employment." *See, e.g.,*

---

[3] Defendants make this argument only with respect to Haymon's reputation-plus claim, and not his stigma-plus claim. Dkt. 10 at 16. Because both theories require an "adverse employment action," however, and because the reputation-plus theory differs from the stigma-plus theory only in that the latter "does not depend on official speech," *O'Donnell*, 148 F.3d at 1140, the Court considers Defendants' argument with respect to Haymon's claim as a whole.

*McCormick v. District of Columbia*, 899 F. Supp. 2d 59, 65 (D.D.C. 2012) (emphasis added) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1160 (D.C. Cir. 1983)).  The D.C. Circuit has observed, in more direct terms, that "[f]or a defamation to give rise to a right to procedural due process, it is necessary . . . that the defamation be accompanied by a discharge from government employment or at least a demotion in rank and pay."  *Mosrie*, 718 F.2d at 1161; *accord. O'Donnell*, 148 F.3d at 1140.  Assuming that "government employment" refers to public employment as it is commonly understood, *i.e.*, "work[] in the service of [the government] under an express or implied contract of hire, under which the [government] has the right to control the details of work performance," *Employee*, Black's Law Dictionary (11th ed. 2019), that principle would seem to defeat Haymon's claim because he was privately employed.

But a closer examination of the caselaw casts doubt on Defendants' threshold argument. As far as the Court can discern, the D.C. Circuit has yet to have occasion to define the contours of "government employment" for purposes of reputation- and stigma-plus claims.  In *Mosrie*, for example, a police officer alleged that his supervisors violated his due process rights by damaging his reputation in public statements and forcing him to transfer "to a job that [was] regarded as a 'dumping ground'" for employees, without providing him an opportunity to challenge their actions.  *O'Donnell*, 148 F.3d at 1140 (quoting *Mosrie*, 718 F.2d at 1156).  The court held that the harms suffered by the plaintiff were insufficient to state a liberty interest claim because he was "merely transferred laterally, not discharged from government employment or demoted in rank and pay."  *Mosrie*, 718 F.2d at 1161.  It was in that context that the D.C. Circuit explained that a liberty interest claim requires "a discharge from government employment or at least a demotion in rank and pay."  *Id*.  The court's focus was not on the nature of the *employment* at

issue, but on the nature of the *harm* suffered by the plaintiff seeking to bring a liberty interest claim.

The Court, accordingly, must examine the relevant cases to determine whether the revocation of an SPO commission constitutes an adverse employment action for purposes of stating a reputation- or stigma-plus claim.  Although a novel question, the Court is persuaded, at least on the facts alleged here, that the revocation of an SPO commission satisfies the loss of "government employment" requirement.

The outer bounds of the liberty interest doctrine are not easily discerned.  The reputation-plus and stigma-plus theories first took shape in *Roth*, a case in which a state employee alleged that his employer deprived him of a protected liberty interest without sufficient due process when it declined to renew his contract.  408 U.S. at 573.  Although the Supreme Court rejected that claim, it observed that "[t]here might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated," such as where "[t]he State, in declining to rehire the respondent, [made] any charge against him that might seriously damage his standing and associations in his community"—*i.e.*, damaged his reputation—or where "the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities"—*i.e.*, stigmatized him.  *Id.*

Four years after *Roth*, the Supreme Court again addressed whether an individual could bring a liberty interest claim for harm to his reputation.  In *Paul v. Davis*, 424 U.S. 693 (1976), a plaintiff alleged that his local police department deprived him of a liberty interest without due process when it circulated a flyer of "active shoplifters" that included his name and picture, *id.* at 695–96.  The Court understood the plaintiff's allegation to be one of "defamation . . . standing

alone and apart from any other governmental action with respect to him." *Id.* at 694. Understood in this light, the Court held that the plaintiff's due process claim failed because "liberty" interests, like "property" interests, "attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law," *id.* at 710, and the plaintiff lacked a cognizable interest in his reputation alone. But, at the same time, the Court recognized that *Roth*'s passages regarding the availability of stigma-plus and reputation-plus claims remained good law. As the Court explained, "it was not thought sufficient [in *Roth*] that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment." *Id.*

After *Paul*, the scope and conceptual basis for the "adverse employment action" requirement is not entirely clear. *See, e.g.*, *Mosrie*, 718 F.2d at 1163 n.8 (Ginsburg, J., concurring) ("The logic of [*Paul*'s] analysis is not crystalline."); *O'Donnell*, 148 F.3d at 1140 ("[T]he conceptual basis for reputation-plus claims is not fully clear."); *see also Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (certain aspects of the doctrine "fit together somewhat uneasily"). At the very least, however, the touchstone of the liberty interest doctrine appears to be that "a constitutionally recognized liberty interest depends on the existence of a special, tangible relationship between the government and the individual in specific contexts." *Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1106 (D.C. Cir. 1985). Defamation or stigmatization, without more, is not enough to make out a constitutional claim.

Against this backdrop, the Court concludes that the District holds a tangible relationship with SPOs and that, accordingly, the District's revocation of Haymon's SPO commission constitutes an "adverse employment action" for purposes of making a reputation-plus or stigma-plus claim. Significantly, the D.C. Circuit has understood the doctrine to allow for claims by

government contractors, who are not government employees.  In *Kartseva v. Department of State*, 37 F.3d 1524 (D.C. Cir. 1994), the plaintiff was fired from her job with a government contractor because the agency "declared her ineligible to work on the [government] contract" on the basis of an unfavorable "background check" related to security concerns, *id.* at 1525–26.  The court held that the plaintiff had made out a stigma-plus claim at the motion-to-dismiss stage.  *Id.* at 1527.  Other cases, too, have acknowledged that government contractors may make out liberty interest clams.  *See Trifax*, 314 F.3d at 644 ("These employment and government contracting due process cases establish what we call a 'reputation plus' requirement."); *Old Dominion Dairy Prod., Inc. v. Sec'y of Def.*, 631 F.2d 953, 962 (D.C. Cir. 1980).  These cases suggest that private employees who depend in significant part for their employment on government approval may avail themselves of reputation- and stigma-plus claims when the government causes their private employer to terminate them.  Haymon fits in that category: he alleges that the government's actions "caused [him] to suffer loss of employment and [an] inability to pursue his career as a special police officer."  Dkt. 1-2 at 13 (Compl ¶ 60).  The Court can discern no difference of constitutional significance between a contractor who is fired due to an unsuccessful government background check and an SPO who, like Haymon, is fired due to his loss of that quasi-governmental status.

It also bears emphasis that although Haymon was not a government employee in the traditional sense, as an SPO, he was granted authority to make arrests—that is, his SPO commission bestowed upon him the authority to exercise a quintessential governmental power.  *See Woodward & Lothrop v. Hillary*, 598 A.2d at 1145 (SPOs are "authorize[d] . . . to exercise arrest powers significantly broader than those of ordinary citizens or licensed security guards").  When exercising that authority, SPOs "'act[] as public officers" [and] 'assume[] all the powers

and liabilities attaching thereto.'" *Id.* at 1146 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 429 (1947)).  At least at times, for example, their actions may be "fairly attributable to the state for purposes of the Fourth Amendment" and may "satisf[y] the 'color of law' prerequisite for a § 1983 suit." *Hillary*, 598 A.2d at 1145.  Thus, while Haymon may not have been a "government employee" for all purposes, his official relationship with the District was "special" and "tangible." *Doe*, 753 F.2d at 1106.  That unique relationship sets this case apart from other cases involving government actions that may only incidentally affect a plaintiff's private employment.

Accordingly, the Court cannot agree that Haymon's liberty interest claim fails as a matter of law for lack of a government "employment" relationship.  Whether Haymon's claims fail for other reasons, however, warrants further consideration.  The Court will, accordingly, turn to Defendants' further arguments for dismissing Count II.

      a.   <u>Reputation-Plus</u>

Defendants further argue that Haymon's reputation-plus claim fails because "he does not allege any public disclosure of the purportedly defamatory information."  Dkt. 10 at 16. "[I]njury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements." *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995).  Haymon alleges that "the professionally denigrating and reputation damaging accusation remained as a part of his record with the SOMB."  Dkt. 1-2 at 9 (Compl. ¶ 38).  According to Defendants, that allegation is insufficient to demonstrate publication because, in Defendants' view, D.C. Circuit precedent precludes "disclosures to other governmental agencies" alone from satisfying the publication requirement.  Dkt. 14 at 9.

The precise contours of the publication requirement in this circuit, as it relates to statements saved in personnel records, are not so simple.  On one hand, the D.C. Circuit has observed that "[t]he 'public disclosure' requirement would . . . be satisfied if [an agency] placed [a plaintiff's] termination memorandum in her personnel file and made that file available, even on a limited basis, to prospective employers or government officials."  *Doe*, 753 F.2d at 1113 n.24.  In subsequent cases, however, the court has opined that "[r]estricted disclosure of [potentially defamatory] material to other . . . agencies, with clear limits on further distribution, is not stigmatizing and does not infringe upon constitutional liberty interests."  *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989).  This tension has led one judge of this court to "follow[] the Circuit's more recent pronouncements . . . that require public dissemination," *Dave v. D.C. Metro. Police Dep't*, 926 F. Supp. 2d 247, 251 (D.D.C. 2013), while another judge has concluded that the later cases "did not clearly displace . . . earlier decisions[,] and it appears that the government's act of placing a statement in a publicly available personnel file would be 'publication,'" *McGinnis v. District of Columbia*, 65 F. Supp. 3d 203, 222 (D.D.C. 2014).

For present purposes, the Court need not resolve any potential tension between the D.C. Circuit's decisions in *Doe v. Department of Justice* and *Cheney*.  Haymon's allegation that the defamatory statement "remained as a part of his record at the SOMB" is sufficient to allow the Court to "draw the reasonable inference" that his record was reviewable by other agencies, *Iqbal*, 556 U.S. at 678, without "clear limits on further distribution," *Cheney*, 885 F.2d at 910.  Whether that record was shared or made available more broadly will become clearer at the summary judgment stage.[4]  Indeed, Defendants themselves observe that "SOMB informed Plaintiff's

_____

[4] In their reply brief, Defendants cite *Dave* for the proposition that "the District's rules or regulations [do not] allow for . . . dissemination absent [an employee's] consent."  Dkt. 14 at 9 n.3 (quoting *Dave*, 926 F. Supp. 3d at 251).  Defendants do not cite any regulation or policy that

employer, Ronald Gaines," that it was able—after much effort—to secure an *unarmed* SPO commission for Haymon.  Dkt. 17 at 7; *see also* Dkt. 17-1 at 12 ("FYI, it took a lot, but I was able to get Mr. Haymon an[] **unarmed** SPO license.") (email from Sergeant Gibson to Ronald Gaines).  It does not require a substantial leap to infer from that informal communication that someone from SOMB would have told Gaines that Haymon had violated the terms of that not-easily-obtained commission and, as a result, had lost it.  For now, however, the Court simply observes that it is premature to decide whether Haymon will be able to satisfy the publication requirement.

A word of caution is in order with respect to Haymon's allegation of defamation.  To prevail on his reputation-plus claim, Haymon must prove that Defendants' assertion regarding his "unlawful discharge of a firearm" was false.  *See Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005).  Given the uncontroverted evidence that Haymon was approved as an "UNARMED SPO ONLY," Dkt. 22 at 1; *see also* Appendix, that may be a difficult showing to make.  That question, however, can—and should—await summary judgment and, if appropriate, trial on the merits.

The Court, accordingly, will deny the District's motion to dismiss with respect to Haymon's reputation-plus claim.

   b. <u>Stigma-Plus</u>

A plaintiff may prevail on a stigma-plus claim by making either of two showings.  First, he may show that "[the government's] action formally or automatically excludes [him] from work on some category of future [government] contracts or from other government employment

---

specifies whether and to what extent SPO records may be accessed, however.  Accordingly, the Court does not find Defendants' passing reference to *Dave* to be dispositive.

opportunities." *Kartseva*, 37 F.3d at 1528.  Second, "even when the government's action does not have the 'binding effect' of a formal exclusion, it may still implicate a liberty interest if it has 'the broad effect of largely precluding [the plaintiff] from pursuing [his] chosen career.'" *Campbell v. District of Columbia*, 894 F.3d 281, 289 (D.C. Cir. 2018) (quoting *O'Donnell*, 148 F.3d at 1141).

Defendants argue that Haymon has failed to state a claim under either theory.  First, they posit that "there is no allegation that MPD has formally barred [Haymon] from future employment either within MPD or, more broadly, with the District government," and Haymon "[does not] allege that the District has formally barred him from reapplying for an SPO commission in the future or show[] that his revocation has automatically or formally disqualified him from future opportunities in other capacities."  Dkt. 10 at 17.  Second, Defendants contend that Haymon "has provided no allegations as to why he could not more broadly seek comparable employment in the security field or even if he has tried to do so and failed."  *Id.*

The Court concludes that Haymon has plausibly alleged a stigma-plus due process violation based on the combination of an adverse "employment" action—the revocation of his SPO commission—and "an attendant stigma affecting his 'freedom to take advantage of other employment opportunities.'"  *Lamb v. Millennium Challenge Corp.*, 498 F. Supp. 3d 104, 114 (D.D.C. 2020) (quoting *O'Donnell*, 148 F.3d at 1140).  For present purposes, the Court must credit Haymon's allegation that the revocation of his SPO commission led to his termination from employment.  *See* Dkt. 1-2 at 13 (Compl. ¶ 60).  Haymon also alleges that he "has been precluded from . . . pursuing his career and employment as an SPO as a direct consequence of [the] revocation."  Dkt. 1-2 at 9 (Compl. ¶ 40).  That allegation is sufficient to establish, at the motion-to-dismiss stage, that Haymon's revocation "'formally or automatically exclude[d]'

[him] from some category of work." *Campbell*, 894 F.3d at 289 (quoting *Kartseva*, 37 F.3d at 1528).  To the extent Defendants argue that Haymon must allege exclusion from direct employment by the MPD or another government agency to make out a stigma-plus claim, the Court rejects that argument for reasons similar to those that the Court discussed at length with respect to the "adverse employment action" requirement: the Court fails to see a difference of constitutional magnitude between formal exclusion from "work[ing] on government contracts," *Kartseva*, 37 F.3d at 1530, and formal exclusion from working as an SPO.

Accordingly, the Court will deny Defendants' motion to dismiss with respect to Haymon's stigma-plus claim.

3.     *Qualified Immunity*

Defendants argue that Defendant McGunigal is entitled to qualified immunity as to Haymon's procedural due process claims because McGunigal did not "violate any clearly established right." Dkt. 10 at 18.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  For a right to have been "clearly established," it must have been "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Here, in light of the foregoing discussion about the novelty of the question presented regarding whether the revocation of an SPO commission constitutes an "adverse employment action" for purposes of stating a liberty interest due process claim, the Court has little difficulty

concluding that the liberty-based due process right at issue was not "clearly established." Accordingly, the Court will dismiss Count II in its entirety as to Defendant McGunigal.

**B.     Tortious Interference Claim (Count III)**

The third count of Haymon's complaint alleges "tortious interference with prospective advantage" in connection with the District's revocation of his SPO commission.  Dkt. 1-2 at 10–13 (Compl. ¶¶ 46–61).  To plead a *prima facie* case of tortious interference with prospective business advantage under D.C. law, a plaintiff must allege "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Jankovic v. Int'l Crisis Grp.,* 593 F.3d 22, 29 (D.C. Cir. 2010) (quoting *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995)).  Defendants move to dismiss Count III (1) as to both Defendants on the ground that Haymon failed plausibly to allege all four elements of tortious interference with prospective advantage, and (2) as to the District on the ground that Haymon failed to comply with the notice requirement in D.C. Code § 12-309(a).

1.      *Elements of Tortious Interference with Prospective Advantage*

The Court need not address all four elements of tortious interference with prospective advantage because Haymon fails to plead the element of intent.  The D.C. Court of Appeals has emphasized that a "strong showing of intent" is necessary to establish a claim for tortious interference with prospective advantage.  *Bennett Enters., Inc.*, 45 F.3d at 499 (quoting *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988)).  Thus, it is not sufficient for a plaintiff to allege a "general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings." *Id.*  Nor is it sufficient for a plaintiff to show merely that the

defendant, "through the legitimate disclosure of truthful information in the ordinary course of business, contributed to" harms suffered by the plaintiff. *Id.*

Haymon's complaint falls well short of pleading facts sufficient to make a "strong showing" of intentional interference. The complaint alleges that McGunigal's revocation of Haymon's SPO commission and subsequent lack of communication were "wrongful," "totally unjustified," "callous," and "egregious," Dkt. 1-2 at 12 (Compl. ¶¶ 56–59), and that McGunigal "harbored unjustified reservations regarding . . . Haymon's clear, defensive use of his firearm in the line of duty," *id.* at 5 (Compl. ¶ 14). None of these allegations, however, describes any "ill motive or intent to disrupt [Haymon's] [prospective] economic advantage." *Bennett Enters., Inc.*, 45 F.3d at 499.

In his opposition, Haymon points out that his complaint alleges that McGunigal "was fully aware of the damages sustained by . . . Haymon's inability to work as an SPO without a commission." Dkt. 12 at 24. It is not enough, however, for Haymon to allege that McGunigal was "aware" of the consequences that would follow from his actions. Rather, to allege a claim for tortious interference, Haymon must show that McGunigal's interference was "improper[]" or "wrongful." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008) (quoting Restatement (Second) of Torts § 766 (Am. L. Inst. 1979)). That requirement is "especially" relevant "when [intent] is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about." Restatement (Second) of Torts § 767. Were it otherwise, countless entities would face potential liability for incidental harms that they cause to business relationships between third parties. Thus, to allege facts sufficient to support a plausible interference that McGunigal's intent was "improper," Haymon must offer some reason—any reason—to believe that

McGunigal "was motivated, in whole or in part, by a desire to interfere with [Haymon's prospective] contractual relations."  *Id*.; *see also Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 346 (D.C. 2015) ("[T]he 'motive' behind [any] interference is the key consideration.").  Because Haymon's complaint says nothing about Defendants' motivation, and says nothing that would permit a plausible inference that Defendants acted with an improper or wrongful purpose, his tortious interference claim fails as a matter of law.

As a final observation, the Court notes—as it did in the context of Haymon's reputation-plus claim—that Defendants' undisputed evidence that Haymon was approved as an "UNARMED SPO ONLY" poses a significant hurdle to Haymon's claim of tortious interference with prospective advantage.  *See* Appendix.  Although he may not have known it at the time, Haymon breached a condition of his SPO commission when he carried a firearm while on duty on May 19, 2019.  Accordingly, it seems likely that McGunigal had a good faith basis to revoke Haymon's SPO commission.  The Court need not reach that conclusion at this juncture because, as discussed, Haymon's complaint fails to allege that McGunigal harbored any ill motive or intent to disrupt Haymon's economic advantage.

2.    *Notice Requirement*

Defendants also argue that Count III should be dismissed as to the District for failure to provide timely notice of his alleged injury to the Mayor or the MPD under D.C. Code § 12-309(a).  The statute provides, in relevant part, that "an action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage."  D.C. Code § 12-09(a).  The statute further provides that

"[a] report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section." *Id.* But "[w]hile a police report can satisfy § 12-309(a), it does so only if it asserts facts from which the District could reasonably anticipate that a claim against the District would arise from plaintiff." *Martin v. District of Columbia*, 720 F. Supp. 2d 19, 25 (D.D.C. 2010).

The Court declines to dismiss Count III as to the District on this ground, however, in light of two considerations. First, failure to satisfy the notice requirement is an affirmative defense that a plaintiff need not assert in his complaint. *See Jaiyeola v. District of Columbia*, 40 A.3d 356, 361 (D.C. 2012). Second, considering Defendants' notice argument would require the Court to examine evidence outside of the pleadings—namely, a police investigation report that Defendants submitted with their motion to dismiss, which was neither mentioned in the complaint nor available to Haymon until after he filed this lawsuit. *See* Dkt. 12 at 26. The Court cannot consider that evidence at the motion to dismiss stage unless the notice requirement in Section 12-309(a) implicates the Court's subject-matter jurisdiction. *See Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, --- F. Supp. 3d ---, 2021 WL 4462723, at *4 (D.D.C. Sept. 29, 2021) ("[A] Rule 12(b)(1) motion may raise a 'factual' challenge to the Court's jurisdiction.")

The question whether the Section 12-309(a) notice requirement is "jurisdictional" is complicated by the fact that "[j]urisdiction . . . is a word of many, too many, meanings." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) (quotation marks omitted). If the Section 12-309(a) notice requirement is jurisdictional in the sense that a plaintiff's failure to comply implicates "the courts' statutory or constitutional power to adjudicate the case," then the Court must determine whether "jurisdiction [is] established as a threshold matter." *Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 89, 94 (1998).  The Court is unpersuaded, however, that Section 12-309(a) poses a jurisdictional hurdle in this case.  To start, there is no reason to doubt that the Court has Article III jurisdiction here; the case presents a live case or controversy and the Court has "original [federal question] jurisdiction over at least one claim" in the case—the due process claims—and the tortious interference claim arises "out of the same Article III case or controversy." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 556 (2005).  And, the Court has statutory jurisdiction over Plaintiff's tortious interference claim pursuant to 28 U.S.C. § 1367.  Thus, as a matter of federal law, this Court has both the "statutory [and] constitutional power to adjudicate the case."  To be sure, the D.C. Court of Appeals has expressly declined to decide whether Section 12–309(a) poses a jurisdictional hurdle to suit, *see Jaiyeola*, 40 A.3d at 356 n.14, but that reservation has no bearing here for two reasons.  First, the D.C. Court of Appeals has not treated a failure to comply with the notice requirement in Section 12-309(a) as a limitation on the power of the courts to adjudicate a case; to the contrary, the D.C. Court of Appeals has held that the requirement "may be waived if not promptly pleaded." *Id.* at 361. Second, in 1985, Congress eliminated the doctrine of derivative jurisdiction for cases removed under the general federal removal statute, 28 U.S.C. § 1441.  *See Robinson v. U.S. Dep't of Health & Hum. Res.*, No. 21-cv-1644, 2021 WL 4798100, at *3 (D.D.C. Oct. 14, 2021).  Under these circumstances, the Court is unconvinced that Section 12-309(a) is not jurisdictional in the sense that this Court must resolve the notice requirement before turning to the merits.  And because the Court has already concluded Plaintiff's tortious interference claim fails a matter of law, and because Defendants' notice defense requires consideration of materials beyond the four-corners of the complaint, the Court will not express a view on that alternative grounds for Defendants' motion.

The Court will, accordingly, dismiss Count III for failure to state a claim.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Dismiss, Dkt. 10, is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that Count I is **DISMISSED**; it is further

**ORDERED** that Count II is **DISMISSED** as to Defendant McGunigal, and that the remainder of Defendants' motion to dismiss Count II is **DENIED**; and, it is further

**ORDERED** that Count III is **DISMISSED.**

**SO ORDERED.**

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date:  June 13, 2022

**APPENDIX**





**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS**
*Occupational and Professional Licensing Administration*

**METROPOLITAN POLICE DEPARTMENT**
*Security Officers Management Branch*

### APPLICATION APPROVAL

DATE REVIEWED: 10|22|2018

NAME OF INDIVIDUAL: Guy Haymon

EMPLOYING AGENCY: Washington Field Protective Svcs.

PHONE NUMBER: 202 515 0241

**APPLICATION TYPE:**

NEW SO Applicant
NEW SPO Applicant ☒
NEW CAMPUS SPO (SCP)
NEW PD
**ACTIVE** LICENSE UPDATE

NEW SAI
NEW SAB
NEW PAI
NEW PDB

**DOCUMENTS REQUIRED:**

Arrest Affidavit ☒
Auth. to Release Information ☒
Criminal History ☒
Drug Screening Report ☒
Range Certification YES ☐ | NO ☐
Physical Examination
SO Exam Verification

**DESIGNATIONS:**

ADD/XFER TO DCPS
CONVERT SPO to SCP
CONVERT SCP to SPO
UPGRADE SPO/SCP
SPO ARMED
UNIFORM WAIVER
Misc.

### CRIMINAL HISTORY REVIEW

APPROVED ☒                     DISAPPROVED ☐

If disapproved, list deficiency:

UNARMED SPO ONLY

_____

REVIEWING OFFICIAL                DATE 11/28/18

TRANSACTION ID: 4007697884

FINGERPRINT DATE: 9/4/18       ATTACHMENT # 8       Initials: CTP

33