## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUY HAYMON,<br><br>         *Plaintiff*,<br><br>    v.<br><br>DISTRICT OF COLUMBIA, *et al.*<br><br>         *Defendants*. | Civil Action No. 1:21-cv-00886 (RDM) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants District of Columbia (the District) and Jeffrey McGunigal respectfully move

for summary judgment under Fed. R. Civ. P. 56(a).  A memorandum of points and authorities, a

statement of material facts as to which there is no genuine dispute, supporting exhibits, and a

proposed order are attached for the Court's consideration.

Date:   December 11, 2023

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Steven N. Rubenstein*
STEVEN N. RUBENSTEIN [1013094]
Acting Chief, Civil Litigation Division Section II

*/s/ Rachel B. Gale*
RACHEL B. GALE [90003972]
Assistant Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7458
rachel.gale@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GUY HAYMON,

            *Plaintiff,*

      v.

DISTRICT OF COLUMBIA, *et al.*

            *Defendants.*

Civil Action No. 1:21-cv-00886 (RDM)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. iii

**INTRODUCTION** .............................................................................................................. 1

**FACTS** ............................................................................................................................ 2

**STANDARD OF REVIEW** ................................................................................................ 9

**ARGUMENT** .................................................................................................................. 10

**I.   The District is Entitled to Summary Judgment on Plaintiff's Procedural Due Process
Claim (Count II).** ...................................................................................................... 10

  **A.   Plaintiff Cannot Establish That He Was Deprived of a Constitutionally-Protected
Liberty Interest Under Either a Reputation-Plus or Stigma-Plus Theory.** ...................... 11

    **1.   Neither the Initial Revocation of Plaintiff's SPO Powers Nor the Revocation of His
Commission Caused an Adverse Employment Action.** ................................................. 12

    **2.   Plaintiff's Due Process Claim Fails Under a Reputation-Plus Claim Theory.** ........ 13

    **3.   Plaintiff's Due Process Claim Fails Under a Stigma-Plus Theory.** ...................... 15

  **B.   Even If Plaintiff Was Deprived of a Protected Liberty Interest, He Was Given All
the Process He Was Due.** ......................................................................................... 19

  **C.   Plaintiff Cannot Establish That a Municipal Policy Caused His Constitutional
Injury.** .................................................................................................................... 22

**II.   Defendants Are Entitled to Summary Judgment on Plaintiff's Tortious Interference
Claim (Count III).** .................................................................................................... 24

**A.    The Court Should Exercise Supplemental Jurisdiction Over Plaintiff's Common Law Claim.** ................................................................................................................ 24

**B.    Plaintiff's Tortious Interference Claim Against the District Is Barred Because He Did Not Comply With § 12–309.** ......................................................................... 25

**C.    Plaintiff Cannot Establish a *Prima Facie* Case of Tortious Interference, and, in Any Event, McGunigal's Conduct Was Justified and Privileged.** .............................. 28

**CONCLUSION** .......................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allen v. District of Columbia*,
  533 A.2d 1259 (D.C. 1987) ........................................................................ 27

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ..................................................................................... 11

*Atherton v. D.C. Office of the Mayor*,
  567 F.3d 672 (D.C. Cir. 2009) ....................................................... 10, 11, 23

*Bd. of Regents v. Roth*,
  408 U.S. 564 (1972) ....................................................................... 11, 12, 15

*Bias v. Advance Int'l, Inc.*,
  905 F.2d 1558 (D.C. Cir. 1990) ................................................................. 10

*Bishop v. Wood*,
  426 U.S. 341 (1976) ................................................................................... 11

*Braxton v. Nat'l Capital Hous. Auth.*,
  396 A.2d 215 (D.C. 1978) .......................................................................... 26

*Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*,
  834 A.2d 77 (D.C. 2003) ............................................................................ 28

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................... 10

*City of Canton v. Harris*,
  489 U.S. 378 (1989) ................................................................................... 22

*Connick v. Thompson*,
  565 U.S. 51 (2011) ..................................................................................... 23

*Crowley v. North Am. Telecomms. Ass'n*,
  691 A.2d 1169 .............................................................................................. 13

*Dave v. D.C. Metro. Police Dep't*,
  926 F. Supp. 2d 247 (D.D.C. 2013) ...................................................... 15, 17

*District of Columbia v. Arnold & Porter*,
  756 A.2d 427 (D.C. 2000) .......................................................................... 26

*District of Columbia v. Dunmore*,
  662 A.2d 1356 (D.C. 1995) ........................................................................ 26

*Dixon v. Love*,
  431 U.S. 105 (1977) ............................................................................. 19, 20

*Doe v. Gates*,
  981 F.2d 1316 (D.C. Cir. 1993) ................................................................. 10

*Doe v. U.S. Dep't of Just.*,
  753 F.2d 1092 (D.C. Cir. 1985) ................................................................. 11

*Edmonson & Gallagher v. Alban Towers Tenants Ass'n*,
  48 F.3d 1260 (D.C. Cir. 1995) ................................................................... 25

*FDIC v. Mallen*,
  486 U.S. 230 (1988) ................................................................................... 19

*Gilbert v. Homar,*
  520 U.S. 924 (1997) ............................................................................................ 19, 20
*Havilah Real Prop. Servs., LLC v. VLK, LLC,*
  108 A.3d 334 (D.C. 2015) ................................................................................... 28, 30
*Haymon v. District of Columbia,*
  610 F. Supp. 3d 101 (D.D.C. 2022) ............................................................................. 18
*Hightower v. City of Bos.,*
  693 F.3d 61 (1st Cir. 2012) ........................................................................................ 20
*Hurd v. District of Columbia,*
  2023 WL 4744056 (D.D.C. July 25, 2023) ................................................................. 22
*In re A.T.,*
  10 A.3d 127 (D.C. 2010) ............................................................................................ 21
*Kartseva v. Dep't of State,*
  37 F.3d 1524 (D.C. Cir. 1994) .................................................................. 11, 16, 18, 19
*Konah v. District of Columbia,*
  815 F. Supp. 2d 61 (D.D.C. 2011) ........................................................................ 24, 25
*Lea v. District of Columbia,*
  2023 WL 4824710 (D.D.C. July 27, 2023) ................................................................. 16
*Los Angeles Cnty. v. Humphries,*
  562 U.S. 29 (2010) ...................................................................................................... 23
*Mack v. United States,*
  6 A.3d 1224 (D.C. 2010) ............................................................................................ 16
*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ...................................................................................... 11, 19, 21
*Matsushita Elec. Indus. Co. v. Zenith Radio,*
  475 U.S. 574 (1986) .................................................................................................... 10
*McGee v. District of Columbia.,*
  646 F. Supp. 2d 115 (D.D.C. 2009) ............................................................................. 26
*McGinnis v. District of Columbia,*
  65 F. Supp. 3d 203 (D.D.C. 2014) ............................................................................... 17
*Monell v. Dep't of Social Servs.,*
  436 U.S. 658 (1978) .................................................................................................... 22
*Mosrie v. Barry,*
  718 F.2d 1151 (D.C. Cir. 1983) ................................................................................... 17
*New Vision Photography Program, Inc. v. District of Columbia,*
  54 F. Supp. 3d 12 (D.D.C. 2014) ................................................................................. 14
*O'Donnell v. Barry,*
  148 F.3d 1126 (D.C. Cir. 1998) .............................................................................. 11, 12
*Onyeoziri v. Spivok,*
  44 A.3d 279 (D.C. 2012) ............................................................................................ 28
*Oparaugo v. Watts,*
  884 A.2d 63 (D.C. 2005) ............................................................................................ 13
*Paul v. Davis,*
  424 U.S. 693 (1976) .................................................................................................... 13
*Payne v. District of Columbia,*
  773 F. Supp. 2d 89 (D.D.C. 2011) ............................................................................... 17

*Precision Contracting Sols., LP v. ANGI Homeservices, Inc.,*
    415 F. Supp. 3d 113 (D.D.C. 2019)................................................................ 30
*R.O. v. Dep't of Youth Rehab. Servs.,*
    199 A.3d 1160 (D.C. 2019) ........................................................................... 21
*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,*
    758 F.3d 296 (D.C. Cir. 2014)...................................................................... 10
*Smith v. District of Columbia,*
    2022 WL 758070 (D.C. Cir. Mar. 4, 2022) ................................................. 23
*Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads,*
    565 A.2d 285 (D.C. 1989) ............................................................................ 30
*Thompson v. District of Columbia,*
    832 F.3d 339 (D.C. Cir. 2016)...................................................................... 22
*Trifax Corp. v. District of Columbia,*
    314 F.3d 641 (D.C. Cir. 2003)...................................................................... 12
*Triplett v. District of Columbia,*
    108 F.3d 1450 (D.C. Cir. 1997).................................................................... 11
*Washington v. District of Columbia,*
    429 A.2d 1362 (D.C. 1981) .......................................................................... 27
*Whitt v. Am. Prop. Constr., P.C.,*
    157 A.3d 196 (D.C. 2017) ............................................................................ 28
*Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia,*
    93 F.3d 910 (D.C. Cir. 1996)........................................................................ 25
*Yancey v. District of Columbia,*
    991 F. Supp. 2d 171 (D.D.C. 2013) ............................................................. 22

**Statutes**

28 U.S.C. § 1367 ............................................................................................ 24, 25
42 U.S.C. § 1983 ............................................................................................ Passim
D.C. Code § 2-510 ............................................................................................... 21
D.C. Code § 5-127.01 .......................................................................................... 18
D.C. Code § 12-309 ......................................................................................... Passim
D.C. Code § 22-4503.01 ....................................................................................... 14

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................... 1, 10

**Regulations**

D.C. Mun. Regs. Tit. 17 § 2100 ........................................................................... 18
D.C. Mun. Regs. Tit. 17 §§ 2120–23 .................................................................... 18

**Other Authorities**

Restatement (Second) of Torts § 766 .................................................................... 30

**INTRODUCTION**

On May 19, 2019, Plaintiff Guy Haymon, who was employed by a private security company and possessed a Special Police Officer (SPO) commission from the District of Columbia that did not permit him to carry or use a firearm, discharged nine rounds at an individual in the parking lot of a grocery store.  In response to this use of force, Metropolitan Police Department (MPD) Senior Sergeant Jeffrey McGunigal preliminarily revoked Plaintiff's police powers, and, following further investigation, MPD revoked his commission, which had by then already expired.  Plaintiff now claims, under 42 U.S.C. § 1983, that Defendant District of Columbia (the District) deprived him of a protected liberty interest without due process under the Fifth Amendment and also asserts a common law claim for tortious interference with prospective advantage against the District and Defendant McGunigal.[1]

Defendants move for summary judgment under Fed. R. Civ. P. 56(a), as Plaintiff's remaining claims cannot stand.  The undisputed evidence makes clear that Plaintiff cannot sustain procedural due process liberty interest claim under either a reputation-plus or stigma-plus theory, and that, even if Plaintiff was deprived of a constitutionally-protected liberty interest, MPD had in place adequate process for Plaintiff to have challenged the revocation of his commission.  What is more, Plaintiff cannot show any damages, as additional process would have resulted in the same outcome, and he has not shown that a municipal policy caused any constitutional injury.  Next, Plaintiff's common law claim against the District is barred due to Plaintiff's failure to provide statutory notice of his claim, and, on the merits, Plaintiff cannot

---

[1]     The Court previously dismissed Plaintiff's § 1983 procedural due process claim based on a deprivation of a property interest (Count I) against both Defendants and dismissed Plaintiff's procedural due process liberty interest claim (Count II) against Defendant McGunigal on qualified immunity grounds.  *See* Am. Mem. Op. & Order, Dkt. 27, at 8–16, 26–27.

show that Defendants intentionally interfered with Plaintiff's business relationships and Defendants' conduct was justified and privileged. Accordingly, the Court should grant this motion and enter summary judgment for Defendants.

**FACTS**

**Plaintiff's Unarmed Special Police Officer Commission and May 19, 2019 Use of Force**

The Metropolitan Police Department's (MPD) Security Officers Management Branch (SOMB) reviews special police officer (SPO) applications and can approve an applicant for either an armed or an unarmed SPO commission. Defendants' Statement of Material Facts as to Which There is No Genuine Dispute (DSMF) ¶ 1. On November 28, 2018, SOMB approved Plaintiff Guy Haymon for an unarmed SPO commission only. *Id.* ¶ 2. And, in 2019, approved SPOs received a plastic card; armed SPO commission cards stated "armed" on the front and unarmed SPO commission cards did not. *Id.* ¶ 3.

On May 19, 2019, Plaintiff was on patrol in the parking lot at the Giant Food Store, located at 1535 Alabama Avenue, SE in Washington, D.C., working as an SPO for Washington Field Protective Services (WFPS), a private security company. *Id.* ¶ 4. Ronald Gaines currently owns WFPS and, on May 19, 2019, was Plaintiff's supervisor at WFPS. *Id.* ¶ 5. At that time, Plaintiff had a valid unarmed SPO commission with an expiration date of May 31, 2019. *Id.* ¶ 6. Plaintiff became aware that he had an unarmed SPO commission prior to May 19, 2019. *Id.* ¶ 7.

Despite having an unarmed SPO commission, Plaintiff was armed with a 9mm firearm and ammunition while he was patrolling the Giant on May 19, 2019. *Id.* ¶ 8. Gaines authorized issuing Plaintiff a firearm while Plaintiff worked for WFPS in 2019, even after SOMB had informed him that Plaintiff was approved for an unarmed SPO commission only. *Id.* ¶ 9. Plaintiff did not have any other license to carry a firearm. *Id.* ¶ 10.

2

While he was on patrol that day, Plaintiff heard gunshots coming from the northeast section of the Giant parking lot.  *Id.* ¶ 11.  After hearing the gunshots and observing people run out of Giant and into the parking lot, Plaintiff located the shooter and the shooter's target.  *Id.* ¶ 12.  Plaintiff fired his weapon at the shooter nine times and the shooter subsequently drove away. *Id.* ¶ 13.

**<u>Preliminary Investigation of Plaintiff's Use of Force</u>**

The Metropolitan Police Department's (MPD) Seventh District and two members of MPD's Security Officers Management Branch (SOMB) responded to the scene of the shooting. *Id.* ¶ 14.  SOMB responded to all use of force incidents involving an SPO to conduct a preliminary administrative investigation.  *Id.* ¶ 15.  SOMB Senior Sergeant Jeffrey McGunigal and Detective Robbie Saunders conducted a preliminary investigation regarding Plaintiff's use of force.  *Id.* ¶ 16.  SPOs are held to the same use of force standards as members of MPD.  *Id.* ¶ 17. And MPD considers the discharge of a firearm to be a serious use of force incident.  *Id.* ¶ 18.

All SPOs and MPD officers involved in a serious use of force incident, including the discharge of a firearm, are subject to an immediate duty status determination that may require temporary revocation of police powers.  *Id.* ¶ 19.  Under MPD policy, MPD has the sole right, authority, and discretion to determine the duty status of a member following a serious use of force incident.  *Id.* ¶ 20.  MPD policy requires the revocation of police powers when necessary to protect the public.  *Id.* ¶ 21.  And once an administrative investigation into an SPO's use of force begins, the SPO's police powers are revoked.  *Id.* ¶ 22.

Upon arriving at the Giant after the shooting, Senior Sergeant McGunigal asked Plaintiff if he had any certification to possess a firearm.  *Id.* ¶ 23.  Plaintiff did not, and has never had, any license or certification to carry or own a firearm in the District of Columbia.  *Id.* ¶ 24.  Senior

3

Sergeant McGunigal proceeded to inform Plaintiff that an investigation would be conducted regarding the shooting and that Plaintiff's SPO police powers would be revoked pending resolution of the investigation.   *Id.* ¶ 25.  When explaining the preliminary revocation process, Senior Sergeant McGunigal also informed Plaintiff that he could continue working for WFPS in a non-SPO capacity while the investigation was pending.  *Id.* ¶ 26.

In accordance with MPD policy, and after informing Plaintiff of the investigation, Senior Sergeant McGunigal completed a duty status form, which Plaintiff signed, that informed Plaintiff that his SPO police powers were being revoked and that he remained subject to all MPD policies and procedures.  *Id.* ¶ 27.  When Plaintiff asked about filing paperwork to renew his SPO commission, which was set to expire on May 31, 2019, Senior Sergeant McGunigal encouraged Plaintiff to submit a renewal application while the administrative investigation was pending.  *Id.* ¶ 28.  The duty status form used for sworn members of MPD is called a PD 77, and, because of this, the duty status form for SPOs is commonly referred to as a "PD 77" or "77." *Id.* ¶ 29.  A change in duty status that revokes an SPO's police powers is a preliminary revocation pending an investigation and not a final revocation of that SPO's commission.  *Id.* ¶ 30.

Because Plaintiff was involved in a serious use of force and an administrative investigation needed to be completed, Senior Sergeant McGunigal was obligated to revoke Plaintiff's police powers.  *Id.* ¶ 31.  The preliminary revocation of police powers cannot be appealed while an administrative investigation is ongoing.  *Id.* ¶ 32.  Senior Sergeant McGunigal completed the duty status form revoking Plaintiff's police powers knowing that Plaintiff was approved for an unarmed SPO commission only and had discharged a weapon at Giant on May 19, 2019.  *Id.* ¶ 33.  Outside of SOMB, Plaintiff's former attorney, Joseph Scrofano, is the only other person who saw the duty status form revoking Plaintiff's police powers.  *Id.* ¶ 34.

Plaintiff's employer, WFPS, did not terminate Plaintiff's employment following the preliminary

revocation of Plaintiff's SPO powers on May 19, 2019, in case there was an available unarmed

post for him. *Id.* ¶ 35. And Plaintiff cannot identify any individual who has a lesser opinion of

his professional reputation or standing due to the May 19, 2019 preliminary revocation of

Plaintiff's SPO commission. *Id.* ¶ 36.

Before May 19, 2019, Plaintiff had never interacted with Senior Sergeant McGunigal. *Id.*

¶ 37. Senior Sergeant McGunigal only conducted the preliminary investigation for Plaintiff's

use of force on May 19, 2019 and was not involved in drafting the final investigative report. *Id.* ¶

38. The preliminary investigation entailed gathering all evidence from the scene and information

that could be obtained regarding the incident for SOMB to start an investigative report; it did not

include any summaries, conclusions, or recommendations as to Plaintiff's employment or any

criminal charging decision. *Id.* ¶ 39. Senior Sergeant McGunigal's involvement in the

investigation ended with the preliminary investigation—he was not involved in the subsequent

investigation, drafting the final investigative report, or notifying Plaintiff of the final

investigation results. *Id.* ¶ 40.

**Final Investigative Report Regarding Plaintiff's Use of Force**

SOMB's Investigative Unit was responsible for handling all cases of criminal and

administrative misconduct of SPOs and Security Officers (SOs) and an SOMB detective would

prepare an investigative report, which would then be reviewed by the Director of Risk

Management and submitted to the Assistant Chief of Police for the Internal Affairs Bureau (IAB)

for approval. *Id.* ¶ 41. After Senior Sergeant McGunigal completed his preliminary

investigation, Senior Sergeant Fulvia Brooks drafted the investigative report for Plaintiff's May

19, 2019 use of force incident. *Id.* ¶ 42.

The final investigative report classified Plaintiff's use of force as justified, with policy violation, and recommended that Plaintiff's SPO commission, which was set to expire on May 31, 2019, be indefinitely revoked. *Id.* ¶ 43. Under MPD policy, a use of force is classified as justified with policy violation when "a use of force is determined to be justified, but during the course of the incident the subject member violated Department policy." *Id.* ¶ 44. The investigation found that Plaintiff's use of force was justified because he discharged his firearm to protect life but that Plaintiff violated MPD policy when he discharged a firearm while performing his duties as an SPO with an unarmed SPO commission and without authorization to possess a firearm. *Id.* ¶ 45.

In 2019, the District's Office of Administrative Hearings (OAH) heard appeals concerning SO certifications, and a designee of MPD's Chief of Police considered appeals related to SPO commissions. *Id.* ¶ 46. To appeal the denial, suspension, or revocation of an SO certification, an individual was required to file a demand for a hearing with OAH within 20 days after service of notice of the action taken. *Id.* ¶ 47. To appeal the denial, suspension, or revocation of an SPO commission, an individual was required to write a letter to the Chief of Police within 21 days after service of notice of the action taken. *Id.* ¶ 48. If the revocation of an SPO commission was appealed, a designee of the Chief of Police would review the final investigative report, including the justification for the revocation, and make sure proper procedures were followed. *Id.* ¶ 49.

Senior Sergeant Brooks submitted the final investigative report to Lieutenant Regina Gamble, the lieutenant in charge of SOMB at the time, for approval, and after approving the report, Lieutenant Gamble then submitted the report to Commander (then Inspector) Kimberly Dickerson, Director of Risk Management, who approved the report and sent it to IAB Assistant

Chief Wilfredo Manlapaz.  *Id.* ¶ 50.  On June 10, 2019, Commander Dickerson approved

Sergeant Brooks's initial investigative report concerning Plaintiff and then sent it to Assistant

Chief Manlapaz, who approved the report and recommendation on June 13, 2019.  *Id.* ¶ 51.

After the IAB Assistant Chief approved a final investigative report conducted by SOMB

recommending the revocation of an SPO commission, the SOMB detective who conducted the

initial investigation would be tasked with notifying the individual who would have their SPO

commission revoked.  *Id.* ¶ 52.  Upon Assistant Chief Manlapaz's approval, Sergeant Brooks

would have had the responsibility to notify Plaintiff of the disposition of the investigation.  *Id.* ¶

53.  Senior Sergeant McGunigal was not assigned the task of notifying Plaintiff of the disposition

of the final investigation regarding his May 19, 2019 use of force.  *Id.* ¶ 54.

In 2019, individuals who had been denied an SPO commission or had their SPO

commission revoked had 21 days to submit a written appeal to MPD's Chief of Police upon

receiving notice, and the Chief's designee would then issue a written determination regarding the

appeal, which would be considered a final agency action.  *Id.* ¶ 55.  Plaintiff learned of the

results of the administrative investigation through his former attorney, Joseph Scrofano.  *Id.* ¶ 56.

Plaintiff did not submit any letter to the Chief of Police appealing either his May 19, 2019

revocation of his SPO powers or the June 2019 revocation.  *Id.*  ¶ 57.

**Plaintiff's Prior Experience with Appeals Process for Denial, Suspension, or Revocation of**
**SPO Commission**

SOMB also performs criminal history checks and criminal history-based eligibility

determinations for all applicants seeking to be licensed by the Department of Licensing and

Consumer Protection (DLCP), formerly part of the Department of Consumer and Regulatory

Affairs (DCRA), as security officers, special police officers, campus special police officers,

security agencies, private detectives, and private detective agencies.  *Id.* ¶ 58.  Plaintiff first

applied for an SPO commission in the District of Columbia on September 8, 2015.  *Id.* ¶ 59.

Plaintiff's 2015 SPO application was denied because Plaintiff wrote "none" for his arrest history

on his application, despite his history of multiple arrests.  *Id.* ¶ 60.  Plaintiff received notification

of the denial of his 2015 SPO application on December 22, 2015, and the denial informed

Plaintiff that he could appeal the denial in writing to the Chief of Police within 21 days of

receipt.  *Id.* ¶ 61.  After receiving notice of the denial, Plaintiff wrote a letter of appeal to the

Chief of Police.  *Id.* ¶ 62.  A designee of the Chief of Police responded to Plaintiff's letter and

denied his appeal on February 3, 2016, noting that that appeal constituted a final agency action.

*Id.* ¶ 63.  Subsequently, Plaintiff applied for an SPO commission again and obtained an unarmed

SPO commission in 2017.  *Id.* ¶ 64.

**Plaintiff's Employment History Since May 2019**

      Individuals who have had an SPO commission revoked are not prevented from re-

applying for an SPO commission; the revocation does not serve to automatically disqualify an

applicant from obtaining a new SPO commission.  *Id.* ¶ 65.  SOMB has no record of Plaintiff

applying for a new SPO commission since MPD revoked his SPO commission, which had by

then expired on May 31, 2019, in June 2019.  *Id.* ¶ 66.  SPOs must apply to renew their SPO

commissions annually, and Plaintiff did not apply for a new SPO commission in 2020, 2021, or

2022.  *Id.* ¶ 67.  The State of Maryland also grants SPO commissions to private individuals;

Plaintiff has not applied to obtain an SPO commission in the state of Maryland.  *Id.* ¶ 68

If Plaintiff were to apply to be an SPO in Maryland, Plaintiff would not also need a District of

Columbia SPO commission and the state of Maryland does not contact MPD's SOMB about

Maryland SPO applicants.  *Id.* ¶ 69.  Additionally, the Federal government authorizes its own

SPOs that work in the District of Columbia who do not need to possess an SPO commission

issued by the District; the federal government would not seek information from MPD's SOMB about a federal SPO applicant.  *Id.* ¶ 70.

Plaintiff began providing security for bars in the District in May 2019.  *Id.* ¶ 71.  After May 19, 2019, Plaintiff has not applied to be certified as an SO in the District of Columbia.  *Id.* ¶ 72.  Nevertheless, Plaintiff currently works for Washington Field Protective Services full-time as a security officer.  *Id.* ¶ 73.  At the time of the May 19, 2019 preliminary revocation of Plaintiff's SPO police powers, Plaintiff made $14/hour working as an SPO for WFPS, and Plaintiff currently makes $18/hour working for WFPS.  *Id.* ¶ 74.

## Plaintiff Failed to Provide the District Notice Under § 12–309 Before Filing Suit

Under D.C. Code § 12-309, the District's Office of Risk Management (ORM) Tort Liability Division receives, processes, and investigates potential claims against the District of Columbia.  *Id.* ¶ 75.  When the ORM Tort Liability Division receives claims notices, either directly or from the Mayor's Office, it records the receipt of said claims notices in its claims management system, called the "Risk Management System."  *Id.* ¶ 76.  Lana Craven, the Program Analyst for the ORM Tort Liability Division, conducted a diligent search of the records placed in ORM's Risk Management System, which entailed a search for claims filed by or for Guy Haymon sought any claims described in the Complaint docketed in No. 2021 CA 000560 B in D.C. Superior Court.[2]  *Id.* ¶ 77.  The result of this search revealed that the Tort Liability Division has received no claims notice(s) from the following named Plaintiff: Guy Haymon.  *Id.* ¶ 78.

**STANDARD OF REVIEW**

---

[2]      Plaintiff initially brought the instant action in D.C. Superior Court, and the case was removed to this Court.  *See* Dkt. 1.

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying evidence that shows that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a movant has made this initial showing, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). In other words, "once the movant has supported a summary judgment motion by evidence of particular events, the court may properly look to the nonmovant for rebuttal evidence either 'from persons familiar with the events,'" or require "the nonmovant to 'otherwise cast more than metaphysical doubt on the credibility of the testimony.'" *Doe v. Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993) (quoting *Bias v. Advance Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C. Cir. 1990)). A trial court should enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which the party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

## ARGUMENT

### I.   The District is Entitled to Summary Judgment on Plaintiff's Procedural Due Process Claim (Count II).

The Fifth Amendment of the U.S. Constitution prohibits government officials from depriving any person of liberty or property without "due process of law." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009). "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (citation and internal quotations omitted). Without a valid, protected interest, there can be no procedural due

process violation.  *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) ("Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process.") (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  If a plaintiff can show the deprivation of a cognizable liberty interest, a court then considers "whether the procedures used by the Government in effecting the deprivation comport with due process." *Id.*

The Due Process Clause does not protect any particular outcome; instead, it merely ensures that the procedures that led to such an outcome are fair.  *See Bishop v. Wood*, 426 U.S. 341, 350 (1976) ("The Due Process Clause . . . is not a guarantee against incorrect or ill-advised . . . decisions.").  Moreover, to successfully assert a procedural due process claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the due process violation resulted from an official municipal policy.  *Atherton*, 567 F.3d at 691 ("Under § 1983 a municipality is liable not under principles of *respondeat superior,* but only for constitutional torts arising from 'action pursuant to official municipal policy.'" (quoting *Triplett v. District of Columbia,* 108 F.3d 1450, 1453 (D.C. Cir. 1997)).

A. **Plaintiff Cannot Establish That He Was Deprived of a Constitutionally-Protected Liberty Interest Under Either a Reputation-Plus or Stigma-Plus Theory.**

"[A] constitutionally recognized liberty interest depends on the existence of a special, tangible relationship between the government and the individual in specific contexts." *Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1106 (D.C. Cir. 1985).  Government employment decisions create this relationship.  *See O'Donnell v. Barry*, 148 F.3d 1126, 1139–40 (D.C. Cir. 1998); *see also Kartseva v. Dep't of State*, 37 F.3d 1524, 1525–26 (D.C. Cir. 1994).  Under the Due Process Clause, adverse government employment decisions are actionable through two theories.  *See O'Donnell*, 148 F.3d at 1140 (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 573 (1972)).  First, a

plaintiff may bring a claim under a reputation-plus theory, "in which the plaintiff points to the conjunction of official defamation and adverse employment action[.]" *Id.* Second, a plaintiff can pursue a stigma-plus theory, "turn[ing] on the combination of an adverse employment action and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities[.]'" *Id.* (quoting *Roth*, 408 U.S. at 573). A stigma-plus claim differs from a reputation-plus claim "in that it does not depend on official speech, but on a continuing stigma or disability arising from official action." *Id.*

> **1.    Neither the Initial Revocation of Plaintiff's SPO Powers Nor the Revocation of His Commission Caused an Adverse Employment Action.**

To start, Plaintiff's claim under either a reputation-plus and a stigma-plus theory fails because Plaintiff cannot show that McGunigal's preliminary revocation of his SPO powers or MPD's later revocation of Plaintiff's SPO commission caused him to suffer an adverse employment action, *see O'Donnell*, 148 F.3d at 1140, and reputational damage and stigma alone "do[] not qualify for due-process protection." *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 31 (D.D.C. 2014) (citing *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003)). Indeed, Plaintiff was never terminated from his employment with WFPS and continues to work there now. *See* DSMF ¶¶ 35, 73. As Plaintiff admitted during his deposition, WFPS did not terminate its employment relationship with him; it maintained his position in case an unarmed post became available. *Id.* Thus, Plaintiff cannot establish that the loss of his SPO powers via the May 19, 2019 PD 77, or the later decision by MPD, constituted an adverse employment action, as such determinations did not necessarily require that WFPS terminate Plaintiff's employment and Plaintiff's employment was never

terminated. *See id.* ¶¶ 26, 35. Therefore, Plaintiff's procedural due process claims fails under

both reputation-plus and stigma-plus theories.

> ### 2. Plaintiff's Due Process Claim Fails Under a Reputation-Plus Claim Theory.[3]

Even if Plaintiff suffered an adverse employment action—and he did not—his reputation-

plus theory still fails because he cannot show that he was defamed when his SPO powers or his

commission were revoked.[4] *See Paul v. Davis*, 424 U.S. 693, 710 (1976). To prove that he was

defamed, Plaintiff must show:

> (1) that the defendant made a false and defamatory statement concerning the
> plaintiff; (2) that the defendant published the statement without privilege to a third
> party; (3) that the defendant's fault in publishing the statement amounted to at
> least negligence; and (4) either that the statement was actionable as a matter of
> law irrespective of special harm or that its publication caused the plaintiff special
> harm.

*Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (quoting *Crowley v. North Am. Telecomms.*

*Ass'n,* 691 A.2d 1169, 1173 n. 2 (D.C. 1997)). Here, Plaintiff was not defamed by the duty

status form that preliminarily revoked his SPO powers because the statements on the form were

substantially true and not defamatory and the form was not published to any third party or

broadly made available. *See id.*; *see also* DSMF ¶¶ 6–10, 24, 34, 45.

*First*, the duty status form did not include any false and defamatory statements.

According to Plaintiff, the duty status form completed by McGunigal includes the false and

---

[3]     Although Plaintiff has apparently conceded that the District is entitled to summary
judgment on his procedural due process claim under a reputation-plus theory. *See* Dkt. 46 at 3
("As a threshold matter, Plaintiff is not contesting the Reputation-Plus claim."). But, out of an
abundance of caution, the District still sets forth its arguments in support of summary judgment
on Plaintiff's reputation-plus theory.

[4]     Although the Complaint does not distinguish between the preliminary and final
revocations, *see* Compl. ¶¶ 15–19, 36–45, Plaintiff's reputation-plus claim appears to rest on the
preliminary revocation, *see id.* ¶ 36–38.

defamatory statement that Plaintiff unlawfully discharged his firearm. *See* Compl. ¶ 37; *see also* Defs.' Ex. 10, at 2 (noting "unlawful discharge of firearm" as "Reason for Revocation"). But Plaintiff indisputably discharged a firearm on May 19, 2019 that he did not have legal authority to possess—he did not have any license to carry a firearm on May 19, 2019 and he had an unarmed SPO commission. *See* DSMF ¶¶ 6–10. And Plaintiff violated MPD policy when he discharged an unlawfully possessed firearm while performing his duties as an SPO with an unarmed SPO commission. DSMF ¶¶ 10, 45.

Contrary to Plaintiff's contentions, the duty status form did not state that Plaintiff committed a particular crime; as McGunigal testified that it was not a charging document, and it did not serve as a warrant for Plaintiff's arrest, which was pursued later without McGunigal's involvement. *See* DSMF ¶ 40; *see also* Defs.' Ex. 4, Deposition of Jeff McGunigal (McGunigal Dep.) 19:14–19; Defs.' Ex. 10 at 2. The form merely stated that Plaintiff had unlawfully discharged a firearm, which he did. *See* DSMF ¶¶ 6–10. And, to the extent that Plaintiff claims that his actions were justified under D.C. Code § 22-4503.01, which provides that no firearm shall be discharged or set off in the District of Columbia without a special written permit from the Chief of Police, "[e]xcept as otherwise permitted by law, including legitimate self-defense," self-defense is an affirmative defense and various conditions must be established before it can be properly invoked by a criminal defendant. *See Mack v. United States*, 6 A.3d 1224, 1230 (D.C. 2010) (setting forth the elements that a criminal defendant must satisfy to invoke a legitimate claim of self-defense and holding that doctrine that one is not guilty of carrying an unlicensed gun, under the District's carrying a dangerous weapon statute, during the period it is actually used in self-defense, is inapplicable where one anticipating harm carries a pistol in public for a period of time before the actual danger arises). Thus, Plaintiff could have raised self-defense as

14

an affirmative defense had he been charged with the crime of unlawful discharge of a firearm—which he was not—but that does not obviate the undisputed facts that Plaintiff discharged a firearm that he did not lawfully possess.

*Second*, the undisputed evidence establishes that the duty status form was not shared with any third-party outside SOMB other than Plaintiff's former attorney, Joseph Scrofano.  *See* DSMF ¶ 34.  And a reputation-plus claim is only available where the defamatory information is publicly disclosed.  *Dave v. D.C. Metro. Police Dep't,* 926 F. Supp. 2d 247, 250-51 (D.D.C. 2013) (noting that "the government must have publicly disclosed the defamatory information" for such a claim to be viable) (collecting cases).

Accordingly, Plaintiff cannot establish that he was defamed when McGunigal preliminarily revoked Plaintiff's SPO powers or that any purportedly defamatory statement in the PD 77 was published to a third-party and Plaintiff's due process claim therefore fails under a reputation-plus theory.

### 3.       Plaintiff's Due Process Claim Fails Under a Stigma-Plus Theory.

Plaintiff also cannot sustain a stigma-plus theory as a matter of law because he cannot show that he was formally excluded or broadly precluded from pursuing his chosen profession in the private security industry.

To succeed on a stigma-plus theory, a plaintiff must establish that "a stigma or other disability . . . foreclosed [his] freedom to take advantage of other employment opportunities[.]" *Roth*, 408 U.S. at 573.  "[A] government action that potentially constrains future employment opportunities must involve a tangible change in status to be actionable under the due process clause.  If a government action does constitute an adjudication of status under law, the

underlying factual and legal determinations are subject to due process protections." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994). There are two ways Plaintiff may establish a stigma-plus theory. *See id* at 1527–28; *see also Lea v. District of Columbia*, No. CV 22-1396 (JEB), 2023 WL 4824710, at *4–5 (D.D.C. July 27, 2023) (analyzing stigma-plus claim and granting summary judgment in favor of the District). "First, if [the government] action formally or automatically excludes [Plaintiff] from work on some category of future . . . government employment opportunities, that action changes [his] formal legal status and thus implicates a liberty interest." *Kartseva*, 37 F.3d at 1527. "Second, if [the government's] action does not have this *binding* effect, but nevertheless has the *broad* effect of largely precluding [Plaintiff] from pursuing [his] chosen career . . . that, too, would constitute a 'status change' adequate to implicate a liberty interest." *Id.* at 1528. Plaintiff cannot make either showing and his procedural due process claim therefore fails under a stigma-plus theory.

The undisputed evidence establishes that the revocation of Plaintiff's SPO police powers and commission in 2019 did not formally exclude him from a category of future government employment opportunities. [5] *See id.* at 1527–28; *see also* DSMF ¶ 65. Indeed, when McGunigal completed the duty status form that preliminary revoked Plaintiff's SPO powers, Plaintiff was *not* precluded from continuing to work for his employer, WFPS, or from applying to renew his SPO commission that was set to expire on May 31, 2019. DSMF ¶¶ 26, 28. McGunigal even encouraged Plaintiff to submit his renewal paperwork. *Id.* ¶ 28. More importantly, the revocation of a previously held SPO commission does not prevent Plaintiff from re-applying for

---

[5]     Notably, the Complaint does not distinguish between the preliminary revocation of Plaintiff's SPO powers and the final revocation of Plaintiff's SPO commission, *see* Compl. ¶¶ 15–19, 36–45, even though McGunigal only preliminarily revoked Plaintiff's SPO powers and had no involvement in the final investigation that indefinitely revoked Plaintiff's SPO commission after it had already expired, *see* DSMF ¶¶ 27, 31, 38, 40.

a new SPO commission and a prior revocation does not automatically exclude Plaintiff from obtaining a new SPO commission from the District in the future.  *See* DSMF ¶ 65.

For his stigma-plus theory to be successful, Plaintiff must show "government action is at fault for the difficulty [in obtaining a job in the field], or at least placed a 'significant roadblock' in [his] path.'"  *McGinnis v. District of Columbia*, 65 F. Supp. 3d 203, 215 (D.D.C. 2014) (quoting *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 96 (D.D.C. 2011)).  But Plaintiff created his own roadblocks here, because his commission expired as of May 31, 2019 and he did not apply for a new SPO commission (or a license to work as a security officer) with the District in 2020, 2021, or 2022, and SOMB has no record of Plaintiff applying for a new SPO commission since June 2019.  *See* DSMF ¶¶ 26, 28, 65–67, 72.  What is more, the State of Maryland and the Federal government also authorize private individuals to work as SPOs and do not require that SPO applicants maintain a District SPO commission, nor do they seek information from SOMB for such applicants; thus, Plaintiff could have applied to be an SPO in Maryland or with the federal government and did not do so.  *Id.* ¶¶ 68–70; *see also Dave*, 926 F. Supp. 2d at 252 (citing *Mosrie v. Barry*, 718 F.2d 1151, 1162 (D.C. Cir. 1983) ("Financial loss and loss of some employment opportunities do not . . . amount to an alteration of a legal right. That must be so even if some of the job opportunities lost are for public jobs, at least when as in this case, the stigmatizing government has no legal authority to alter legal rights to seek employment with another government.")).  Accordingly, the undisputed evidence demonstrates that there is no formal bar on Plaintiff's reapplication for an SPO commission with the District or other jurisdictions, including the Federal government, and no evidence exists that McGunigal's preliminary revocation or MPD's later decision automatically excludes him from employment opportunities in the private security industry.  To the contrary, Plaintiff admits he has not applied

for a new SPO commission since 2019 and that he is currently employed by the same private security agency as he was in 2019, albeit as a security officer.  *See* DSMF ¶¶ 66–67, 73.

And Plaintiff has no evidence to show that the actions at issue preclude him from such a broad range of opportunities that it "interferes with his constitutionally protected right to follow a chosen trade or profession." *Kartseva*, 37 F.3d at 1528–29 (citations and internal quotations omitted).[6]   Plaintiff cannot show that the revocation of his SPO commission in 2019 has otherwise prevented him from pursuing his chosen career in the private security industry more broadly.  *See* DSMF ¶¶ 65–74. Indeed, he is currently employed by the same employer, Washington Field Protective Services, in the capacity of a security officer, *see id.* ¶¶ 73–74, and he has no evidence showing that he sought other private security officer positions, or SPO positions, with other private firms and was turned away.  What is more, the undisputed evidence shows that Plaintiff can still be employed as a private security officer and that there are other SPO opportunities in the District with federal government agencies and in other jurisdictions that do not require a District-issued SPO.  *See id.* ¶¶ 69–70, 73.

Accordingly, Plaintiff cannot show that the revocation of his SPO powers as of May 19, 2019 and his commission in June 2019 formally excluded him, or largely precluded him, from

---

[6]    Indeed, considering that the Mayor has unfettered discretion to approve and revoke SPO commissions, *see Haymon v. District of Columbia*, 610 F. Supp. 3d 101, 109–113 (D.D.C. 2022) (citing D.C. Code § 5-127.01), Plaintiff arguably has no constitutionally protected liberty interest in the pursuit of the chosen profession of "special police officer" in the District of Columbia, and the inquiry should not be framed so narrowly but should instead focus on Plaintiff's ability to follow a chosen trade in the private security industry, which contains numerous careers, including that of a security officer.  *See* DSMF ¶¶ 46–47, 58; *see also* D.C. Mun. Regs. Tit. 17 § 2100 *et seq.* (relating to security officers).  Indeed, District law, by affording licensed security officers with additional procedural protections, including the right to a hearing before the Office of Administrative Hearings, *see, e.g.*, D.C. Mun. Regs. Tit. 17 §§ 2120–23, recognizes a distinction between a professional occupational license for security officers and the temporary grant of police powers that is bestowed by an SPO commission that is revocable at any time with no limitation on the Mayor's discretion to do so.

working as an SPO or from the broader private security industry, and therefore did not implicate a constitutionally protected liberty interest.  *See Kartseva*, 37 F.3d at 1527–28; DSMF ¶¶ 27, 29, 65–70.  Thus, Plaintiff's claim fails under a stigma-plus theory.

**B.**     **Even If Plaintiff Was Deprived of a Protected Liberty Interest, He Was Given All the Process He Was Due.**

While the undisputed evidence establishes that Plaintiff was not deprived of a protected liberty interest, even if he was, MPD's procedures satisfy due process, and, alternatively, Plaintiff cannot show that he was damaged by any purported deprivation.

"Once it is determined that due process applies, the question remains what process is due." *FDIC v. Mallen*, 486 U.S. 230, 240 (1988).  The requirement for procedural due process "'is flexible and calls for such procedural protections as the particular situation demands.'" *Mathews*, 424 U.S. at 334. "[I]dentification of the specific dictates of due process generally requires" courts to look at three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest."  *Id.* at 335.  It is the "ordinary principle . . . that something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Id.* at 343.

To start, at the time of the preliminary revocation of Plaintiff's SPO police powers, the District's weighty interest in protecting the public outweighed Plaintiff's interest in maintaining his police powers and the risk of erroneous deprivation.  It is well-established that pre-deprivation process is not constitutionally required "where a State must act quickly, or where it would be impractical to provide predeprivation process." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (collecting cases); *see Dixon v. Love*, 431 U.S. 105 (1977).  That is the case here.  The District has a substantial public safety interest in ensuring that individuals who are not public

employees do not abuse the limited and extraordinary police powers the Mayor has authorized, which justifies the need for quick action.  *See Gilbert*, 520 U.S. at 932 (noting strong governmental interest "in preserving public confidence in its police force"); *cf. Hightower v. City of Bos.*, 693 F.3d 61, 85 (1st Cir. 2012) ("The revocation of a firearms license, particularly a license to carry a concealed, large capacity weapon, without a predeprivation hearing is justified by concerns as to public health and safety.").  SPOs, just like sworn-MPD officers that are involved in serious use of force incidents, including the discharge of a firearm, are subject to an immediate duty status determination that may require temporary revocation of police powers.  *See* DSMF ¶ 19.  And MPD policy requires the revocation of police powers when necessary to protect the public and that MPD has the sole right, authority, and discretion to determine the duty status of a member involved in a serious use of force incident.  *Id.* ¶¶ 20–21.  At the time that Plaintiff's SPO powers were preliminary revoked, he had just discharged a firearm—and did so without having any certification or SPO commission authorizing the possession of a firearm— and SOMB needed to complete an administrative investigation of the incident.  *Id.* ¶¶ 13, 18, 24, 31.  Because the only factual basis necessary for the preliminary revocation of police powers was whether Plaintiff was involved in a serious use of force, a proposition for which there was and is no possible dispute, there was also no risk of erroneous deprivation.  *See Dixon*, 431 U.S. at 113 (noting "the risk of an erroneous deprivation in the absence of a prior hearing is not great" for summary suspension or revocation of drivers' licenses where the factual basis for the decision is not meaningfully disputed).  What is more, Plaintiff's SPO commission was set to expire 12 days after the initial revocation and SPO commissions must be renewed annually.  *Id.* ¶ 6, 67.  Thus, because this was only a preliminary revocation, Plaintiff's interest in temporarily losing his time-limited police powers pending MPD's administrative investigation, and the negligible risk of

erroneous deprivation, was vastly outweighed by the District's significant interest in protecting the public. *See Mathews*, 424 U.S. at 335.

Second, Plaintiff had available to him post-deprivation process for the final revocation of his SPO commission. SOMB's final investigative report recommended the indefinite revocation of Plaintiff's SPO commission and was approved by IAB Assistant Chief Manlapaz on June 13, 2019—two weeks after the commission had already expired. DSMF ¶¶ 45, 52. Plaintiff testified that his then-attorney, Joseph Scrofano, was informed of the final investigative report findings. *Id.* ¶ 57. Subsequently, Plaintiff could have, but did not, appeal the final revocation decision through the same MPD appeal process that he had previously availed himself of when he was denied a commission in 2015. *See* DSMF ¶¶ 48–49, 56–57, 59–63. And Plaintiff does not, and cannot, dispute that, in 2019, the process for appealing denial of an SPO application and the revocation of an SPO commission was the same. *Id.* ¶¶ 49, 55. Thus, after Plaintiff received notification of the final investigative report that indefinitely revoked his commission, he had 21 days to write a letter to MPD's Chief of Police. DSMF ¶ 48–49, 55. And because Plaintiff previously appealed the denial of his SPO application, he was familiar with this process. *See* ¶¶ 55–56, 59–63.[7]

In any event, even if "a plaintiff establishes that he was [deprived of a protected liberty interest] without due process and demonstrates damages arising from that [deprivation]," a

---

[7]     Additionally, District law provides judicial review of final agency actions, and MPD considers its appeal determinations to be final agency actions. *See id.* ¶ 55 (noting that appeals are considered final agency actions); D.C. Code § 2-510 (providing for judicial review by the District of Columbia Court of Appeals for any person suffering a legal wrong, or adversely affected or aggrieved, by an agency in a contested case); *R.O. v. Dep't of Youth Rehab. Servs.*, 199 A.3d 1160, 1165 (D.C. 2019) ("A party aggrieved by an agency action in a non-contested case ordinarily may seek review in the Superior Court.") (citing *In re A.T.*, 10 A.3d 127, 134 (D.C. 2010)).

defendant is not responsible for those damages if it shows the damages "would have occurred regardless." *Hurd v. District of Columbia*, No. 15-CV-666 (JDB), 2023 WL 4744056, at *10 (D.D.C. July 25, 2023) (citing *Thompson v. District of Columbia*, 832 F.3d 339, 346 (D.C. Cir. 2016)). Here, Plaintiff's time-limited SPO commission expired on May 31, 2019—before IAD approved the revocation—and, even, if Plaintiff had appealed the final revocation, he indisputably had no SPO commission authorizing him to possess or use a firearm on May 19, 2019. *See* DSMF ¶¶ 2, 6, 10, 13, 24, 33, 45. Thus, Plaintiff's commission had expired by the time of IAD's final decision in June 2019 and the same outcome would have occurred even if Plaintiff had received additional process, so Plaintiff cannot show any damages resulting from the purported deprivation of due process and the District is therefore entitled to summary judgment.

### C.   Plaintiff Cannot Establish That a Municipal Policy Caused His Constitutional Injury.

Lastly, Plaintiff's procedural due process claim fails because he cannot establish that he suffered a constitutional injury as a result of a District policy. "In order to hold a municipality liable for civil rights violations under 42 U.S.C. § 1983, the municipality must have acted in accordance with a 'government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Yancey v. District of Columbia*, 991 F. Supp. 2d 171, 179 (D.D.C. 2013) (quoting *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978)). Further, the policy must have been "the moving force behind the constitutional violation." *City of Canton v. Harris,* 489 U.S. 378, 389 (1989).

Here, Plaintiff has not put forth any evidence showing, or even alleged, that a District policy caused a deprivation of due process. *See* DSMF ¶¶ 1–78; Compl. Although Plaintiff contends that there were procedural defects in the revocation of his SPO commission, *see*

Compl., he does not assert that a District policy was the moving force behind any due process deprivation, Compl. ¶¶ 44–45. To be sure, even if Plaintiff did not receive adequate notice of the results of the final investigation or his appeal rights, that is not enough to hold the District liable under § 1983. *See Connick v. Thompson*, 565 U.S. 51, 70 n.12 (2011) ("We stand by the longstanding rule—reaffirmed by a unanimous Court earlier this Term—that to prove a violation of § 1983, a plaintiff must prove that 'the municipality's own wrongful conduct' caused his injury, not that the municipality is ultimately responsible for the torts of its employees." (quoting *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 38 (2010)); *see also Smith v. District of Columbia*, No. 21-7006, 2022 WL 758070, at *5 (D.C. Cir. Mar. 4, 2022) ("The evidence did not make it more likely than not that a custom or policy of the District—as opposed to individual employee errors—caused Smith's over-detention."); *Atherton*, 567 F.3d at 691 (affirming District Court's dismissal of § 1983 procedural due process claim against the District for failure to allege municipal liability). Plaintiff cannot show that a District policy, rather than an administrative oversight or employee negligence, caused his alleged constitutional injury via inadequate notice. *See* DSMF ¶¶ 41–57. As the District has shown, MPD had an appeals process in place for revocations of SPO commissions—the same process Plaintiff had previously taken advantage of when his first application was denied in 2015—and a standard process for the notification for such decisions, and Plaintiff has no evidence to show that the District had a policy or custom of failing to notify individuals after a commission had been revoked or that the District was deliberately indifferent to such a possibility. *See id.* ¶¶ 48–49, 53, 55, 61–62; *see also* Defs.' Ex. 6, Declaration of Kimberly Dickerson (Dickerson Decl.) ¶ 6 (noting that two other individuals had appealed the revocation of their SPO commissions in the two years preceding Plaintiff's revocation); Defs.' Ex. 4, McGunigal Dep. at 46 (45:2–6) (stating that notice was typically

conveyed by phone call, but also by email and certified mail when warranted). Therefore,

Plaintiff's procedural due process claim fails as a matter of law, as he cannot show that a

municipal policy was the moving force behind any purported deviation from these procedures.

    In sum, because Plaintiff cannot establish that he suffered an adverse employment action,

the deprivation of a protected liberty interest, an entitlement to additional process, or the

District's municipal liability, the Court should grant summary judgment to the District on Count

II of the Complaint.

## II.    Defendants Are Entitled to Summary Judgment on Plaintiff's Tortious Interference Claim (Count III).

    Plaintiff's tortious interference claim also falls short as a matter of law. First, Plaintiff's

tort claim against the District is barred because he failed to provide statutory notice under D.C.

Code § 12–309 before filing suit. Second, Plaintiff's tortious interference claim falters on the

merits because he cannot establish a necessary element of his claim—intentional interference

with his business relationship by Defendants. Finally, McGunigal's conduct was justified and

privileged. Accordingly, Defendants are entitled to summary judgment on Count III of the

Complaint.

### A.    The Court Should Exercise Supplemental Jurisdiction Over Plaintiff's Common Law Claim.

    As an initial matter, the Court should exercise supplemental jurisdiction over Plaintiff's

common law claim. Because the basis for federal jurisdiction would fall away after dismissal of

the § 1983 claim against the District, the Court will have to decide whether to retain

supplemental jurisdiction over Plaintiff's common law claim. *See* 28 U.S.C. § 1367. In deciding

whether to exercise supplemental jurisdiction, the "court must first determine whether the state

and federal claims derive from a common nucleus of operative fact." *Konah v. District of*

24

*Columbia*, 815 F. Supp. 2d 61, 78 (D.D.C. 2011) (citing *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996)).  If so, "the court then must decide whether to exercise its discretion to assert jurisdiction over the state claim."  *Id.* at 78–79. In making this determination, the court must weigh factors of judicial economy, convenience, fairness, and comity.  *Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265–66 (D.C. Cir. 1995).

While, ordinarily, if a court dismisses the claims from which its jurisdiction arises the court should dismiss the common law claims under 28 U.S.C. § 1367, the Court here should exercise supplemental jurisdiction over Plaintiff's common law claim.  First, his federal and state law claims derive from a common nucleus of operative facts.  And, as to the factors of judicial economy, convenience, fairness, and comity, the parties have litigated this matter for over two years through discovery in this Court, which has already issued a thorough memorandum opinion and order addressing Defendants' motion to dismiss, and dismissing the common law claim at this juncture would serve only to prolong the case while the new court familiarized itself with the factual and procedural background of the case.  Moreover, the case does not raise novel questions of state law.  Therefore, the Court should exercise supplemental jurisdiction over Plaintiff's common law claim.

B.     <u>**Plaintiff's Tortious Interference Claim Against the District Is Barred Because He Did Not Comply With § 12–309.**</u>

Plaintiff's failure to provide statutory notice under D.C. Code § 12–309 before filing the Complaint forecloses his tort claim against the District.[8]  Section 12–309 "imposes a notice

---

[8]     The District raised this defense in its motion to dismiss the Complaint, but the Court passed on reaching the issue at the pleading stage because it relied on materials outside of the pleadings.  *See* Am. Mem. Op. & Order, Dkt. 27, at 29–31.

requirement on everyone with a tort claim against the District of Columbia." *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995).[9]  Notice must be provided *before* filing a lawsuit against the District and cannot be provided after filing suit.  *McGee v. District of Columbia.*, 646 F. Supp. 2d 115, 121 (D.D.C. 2009).  Section 12–309 is to be construed narrowly against claimants "because it is in derogation of the common law principle of sovereign immunity."  *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 436 (D.C. 2000) (citations omitted).  Furthermore, "[w]hile . . . 'precise exactness' in the notice statement [is not required], the requirements of the statute are nevertheless to be strictly construed."  *Braxton v. Nat'l Capital Hous. Auth.*, 396 A.2d 215, 217 (D.C. 1978) (citations omitted).  Here, Plaintiff did not provide notice of his tortious interference claim against the District before filing this suit.  *See* DSMF ¶¶ 75–78.  Therefore, Plaintiff's tort claim against the District is barred.  *See Arnold & Porter*, 756 A.2d at 436 ("Unless it demonstrates compliance with the requirements of § 12–309, a plaintiff's suit against the District is properly dismissed because no right of action or entitlement to maintain an action accrues.") (citation and quotation marks omitted).

Moreover, Plaintiff's tort claim cannot be saved through any reliance on MPD's investigative report because it did not provide notice to the District of Plaintiff's claim.  Under § 12–309, "[a] report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section."  D.C. Code § 12–309(a).  But the mere "existence of a police report does not necessarily mean that the District has received the type of actual notice

---

[9]     Section 12–309 states, in pertinent part:

An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.

which § 12–309 contemplates." *Allen v. District of Columbia*, 533 A.2d 1259, 1262 (D.C.

1987).  Rather, for a police report to provide "sufficient notice," it "must contain information as

to time, place, cause and circumstances of injury or damage with at least the same degree of

specificity required of a written notice." *Washington v. District of Columbia*, 429 A.2d 1362,

1367 n.17 (D.C. 1981) (citation omitted).

      To satisfy the "cause" element, the police report must "recite[] facts from which it could

be reasonably anticipated that a claim against the District might arise." *Id.* (citation, footnote, and

quotation marks omitted).  The written notice or police report must disclose both the factual

cause of the injury *and* a reasonable basis for anticipating legal action as a consequence.  *Id.* at

1366.  Such notice would suffice "if it either characterized the injury and asserted the right to

recovery, or without asserting a claim described the injuring event with sufficient detail to reveal,

in itself, a basis for the District's potential liability." *Id.*  "As to the 'circumstances' element

under § 12–309 . . . the adequacy of the circumstances described must be determined with

reference to the purpose of the statutory notice requirement which is to give the District timely

information concerning a claim against it, so it may adequately prepare its defense." *Id.*

(citations, ellipses, and quotation marks omitted).

      Here, MPD's final report does not satisfy either the "cause" requirement or the

"circumstances" requirement because it does not provide the District a "reasonable basis for

anticipating legal action as a consequence" arising from the preliminary revocation of Plaintiff's

SPO powers.  *Id.*  Indeed, it does not provide any facts indicating, or even suggesting, that

Defendant McGunigal acted with improper intent to harm Plaintiff's prospective business

expectancies by recommending the final revocation, which he did not even recommend.  *See*

DSMF ¶¶ 43–45.  Nor does the final report provide the District with any indication of Plaintiff's

purported injuries resulting from the revocation.  *Id.*  As a result, Plaintiff cannot show that he complied with D.C. Code § 12–309(a), and the Court should grant summary judgment to the District on Count III of the Complaint.

### C.      **Plaintiff Cannot Establish a *Prima Facie* Case of Tortious Interference, and, in Any Event, McGunigal's Conduct Was Justified and Privileged.**

Plaintiff's tortious interference claim also fails on the merits against the District and McGunigal.  Defendants are entitled to summary judgment on Plaintiff's tort claim because Plaintiff cannot establish that Defendants intentionally interfered with Plaintiff's business relationships and McGunigal's conduct was legally justified.

"To make out a prima facie case of tortious interference, the plaintiff must demonstrate: '(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages.'"  *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345–46 (D.C. 2015) (quoting *Onyeoziri v. Spivok,* 44 A.3d 279, 286–87 (D.C. 2012)).  "The elements of tortious interference with prospective business advantage mirror those of interference with contract," except Plaintiff "need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction."  *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003) (citations omitted).  Plaintiff's claim falls short at the third element.

The undisputed evidence shows that Defendants did not intentionally interfere with Plaintiff's business relationships.  Interference with business or contractual relations can be proven when the actor "knows that the interference is certain or substantially certain to occur as a result of his action." *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017).  Here, McGunigal only revoked Plaintiff's SPO powers pending the results of the administrative

investigation regarding Plaintiff's use of deadly force.  *See* DSMF ¶¶ 26–27, 31.  Completing a duty status form—which is the only action McGunigal took in revoking Plaintiff's police powers—is a preliminary revocation of Plaintiff's police powers and not a final revocation of his commission.  *Id.* ¶¶ 29–30.  Thus, in preliminarily revoking Plaintiff's police powers pending the results of the administrative investigation, McGunigal did not know and could not be substantially certain that his actions would cause Plaintiff "to suffer loss of employment and inability to pursue his career as a special police officer."  Compl. ¶ 60; *see* DSMF ¶¶ 26, 28, 30, 39, 42.  Indeed, as Plaintiff testified, the issuance of the PD 77 *did not* result in the severing of Plaintiff's employment with WFPS.  *Id.* ¶¶ 36, 73–74.  And McGunigal did not make any sort of recommendation about Plaintiff's employment status to Plaintiff's employer.  DSMF ¶ 39.  On the contrary, McGunigal advised Plaintiff that he could still work for WFPS in a non-SPO capacity while his police powers were revoked.  *Id.* ¶ 26.  Nor did McGunigal's actions prevent Plaintiff from applying to renew his SPO commission, which was set to expire 12 days after the use of force incident, or seeking a new SPO commission after May 31, 2019.  *Id.* ¶¶ 28, 65.  McGunigal even encouraged Plaintiff to submit paperwork to renew his SPO commission.  *Id.* ¶ 28.  To date, Plaintiff has not applied for a new SPO commission.  *Id.* ¶¶ 66–67.  And Plaintiff continues to work for WFPS, his employer at the time that McGunigal preliminarily revoked Plainitff's SPO commission.  *Id.* ¶¶ 4, 73–74.  Thus, Plaintiff cannot show that McGunigal, or under a *respondeat superior* theory, the District, intentionally interfered with his business relationships.

Nevertheless, Defendants are entitled to summary judgment on Plaintiff's tortious interference claim because McGunigal's conduct was justified and privileged.  "Even if [a *prima facie* case is made], however, a claim for tortious interference fails if the defendant shows 'that

his or her conduct was justified or privileged.'" *Precision Contracting*, *Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*, 415 F. Supp. 3d 113, 122 (D.D.C. 2019). (quoting *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads*, 565 A.2d 285, 290 (D.C. 1989)). To make this showing, the defendant must establish that his conduct was "legally justified." *Sorrells*, 565 A.2d at 290. Seven factors are considered in making this determination:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* (citing Restatement (Second) of Torts § 766)). "[T]he 'motive' behind [any] interference is the key consideration." *Havilah Real Prop. Servs.*, 108 A.3d at 346 (citing *Sorrells*, 565 A.2d at 290).

Here, McGunigal's conduct was patently justified and privileged. McGunigal preliminarily revoked Plaintiff's SPO commission for one reason: Plaintiff used deadly force when he fired nine shots in the Giant parking lot. DSMF ¶¶ 13, 18. All SPOs, and even all sworn-MPD officers, involved in a serious use of force incident are subject to an immediate duty status determination that may require temporary revocation of police powers. *Id.* ¶ 19. Furthermore, MPD policy requires the revocation of police powers when necessary to protect the public. *Id.* ¶ 21. When McGunigal completed the duty status form revoking Plaintiff's police powers, Plaintiff had discharged a firearm, despite knowing SOMB had approved him for an unarmed SPO commission only and that he had no certification to carry or own a firearm in the District of Columbia. *Id.* ¶¶ 2, 4, 10, 13, 23–24, 33. And if an administrative investigation is opened, which happened here, SOMB revoked an SPO's police powers pending resolution of the investigation. *Id.* ¶¶ 22, 27.

30

The undisputed evidence shows that, in preliminarily revoking Plaintiff's SPO powers, McGunigal acted to ensure public safety, in compliance with MPD policy.  Before May 19, 2019, Plaintiff testified that he and McGunigal had never interacted, and, therefore, McGunigal harbored no ill will toward Plaintiff or any other illicit motive as of May 19, 2019.  *Id.* ¶ 37. Indeed, McGunigal informed Plaintiff that an investigation would be conducted regarding the shooting, that Plaintiff's SPO powers would be revoked pending resolution of the investigation, and that Plaintiff could continue working for WFPS while the investigation was pending.  *Id.* ¶¶ 26–27.  And McGunigal, by Plaintiff's own admission, encouraged Plaintiff to submit his application for a new commission regardless of the administrative investigation, as his then-current commission was set to expire on May 31, 2019, further showing that McGunigal had no interest in interfering with Haymon's livelihood or relationship with WFPS.  *See id.* ¶ 28.  Thus, McGunigal both protected the public and supported Plaintiff in continuing his employment with WFPS, showing that he acted in good faith, not with tortious intent.  Therefore, McGunigal's conduct, and by extension the District's conduct, was legally justified.

Because Plaintiff cannot prove a required element of his claim—intentional interference with business relations—and the undisputed evidence establishes that McGunigal's conduct was legally justified, Defendants are entitled to summary judgment on Count III of the Complaint.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion for summary judgment and dismiss the Complaint with prejudice.

Date:   December 11, 2023                     Respectfully submitted,

                                              BRIAN L. SCHWALB
                                              Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Steven N. Rubenstein*
STEVEN N. RUBENSTEIN [1013094]
Acting Chief, Civil Litigation Division Section II

*/s/ Rachel B. Gale*
RACHEL B. GALE [90003972]
Assistant Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7458
rachel.gale@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GUY HAYMON,<br><br>　　　　　　*Plaintiff*,<br><br>　　v.<br><br>DISTRICT OF COLUMBIA, *et al.*<br><br>　　　　　　*Defendants*. | Civil Action No. 1:21-cv-00886 (RDM) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO
GENUINE DISPUTE**

Under Fed. R. Civ. P. 56(c), Defendants District of Columbia (the District) and Jeffrey

McGunigal submit the following Statement of Material Facts as to Which There Is No Genuine

Dispute:

**Plaintiff's Unarmed Special Police Officer Commission and May 19, 2019 Use of Force**

1.　　　The Metropolitan Police Department's (MPD) Security Officers Management Branch

　　　　(SOMB) reviews special police officer (SPO) applications and can approve an applicant

　　　　for either an armed or an unarmed SPO commission. *See* Defs' Ex. 1, Nov. 28, 2018

　　　　SPO Application Approval Form for Guy Haymon, at 2.

2.　　　On November 28, 2018, SOMB approved Plaintiff Guy Haymon for an unarmed SPO

　　　　commission only. *Id.*

3.　　　In 2019, approved SPOs received a plastic card; armed SPO commission cards stated

　　　　"armed" on the front and unarmed SPO commission cards did not. *See* Defs.' Ex. 2,

　　　　Deposition of Guy Haymon (Haymon Dep.) at 107–10 (106:18–109:7).[10]

---

[10]　　Defendants include the PDF page number of the cited deposition transcript and the
internal page number and line range in parentheses.

4.      On May 19, 2019, Plaintiff was on patrol in the parking lot at the Giant Food Store,
        located at 1535 Alabama Avenue, SE in Washington, D.C., working as an SPO for
        Washington Field Protective Services (WFPS).  Defs.' Ex. 2 Haymon Dep. at 62–63, 66
        (61:22–62:3, 65:8–22); Defs.' Ex. 3, Final Investigative Report, at 2.

5.      Ronald Gaines currently owns WFPS and, on May 19, 2019, was Plaintiff's supervisor at
        WFPS.  *See* Defs.' Ex. 2, Haymon Dep. at 49 (48:6–17).

6.      At that time, Plaintiff had a valid unarmed SPO commission with an expiration date of
        May 31, 2019.  *See* Defs.' Ex. 1 at 2, 10–11; Defs.' Ex. 2, Haymon Dep., at 50, 160
        (49:1–4, 159:5–10); Defs.' Ex. 4, Deposition of Jeffrey McGunigal (McGunigal Dep.) at
        19 (18:5–11); Defs.' Ex. 5, Emails Between Sergeant Edward Gibson and Ronald Gaines.

7.      Before May 19, 2019, Plaintiff was aware that he held an unarmed SPO commission .
        *See* Def.'s Ex. 2, Haymon Dep. at 107–10 (106:18–109:7).

8.      Despite possessing an unarmed SPO commission, Plaintiff was armed with a 9mm
        firearm and ammunition while he was patrolling the Giant on May 19, 2019.  *See* Defs.'
        Ex. 2, Haymon Dep. at 65–66 (64:8–65:7); Defs.' Ex. 3 at 10.

9.      Ronald Gaines authorized that Plaintiff be issued a firearm while Plaintiff worked for
        WFPS in 2019, despite having been informed that Plaintiff did not possess an armed SPO
        commission.  *See* Defs.' Ex. 1 at 2; Defs.' Ex. 2, Haymon Dep. at 49 (48:13–17); Defs.'
        Ex. 5.

10.     Plaintiff did not have any legal certification to carry a firearm on May 19, 2019.  Defs.'
        Ex. 2, Haymon Dep. at 60 (59:13–16); Defs.' Ex. 3 at 10–11.

11.     While he was on patrol that day, Plaintiff heard gunshots coming from the northeast

        section of the Giant parking lot.  Defs.' Ex. 2, Haymon Dep., at 66–67, 70 (65:8–66:7,

        69:6–16); Defs.' Ex. 3 at 2, 7.

12.     After hearing gunshots and observing people run out of Giant into the parking lot,

        Plaintiff located the shooter and the shooter's target.  Ex. 3 at 2; Ex. 2 at 67–71 (Haymon

        Dep. 66:5–70:10).

13.     Plaintiff fired his weapon at the shooter nine times and the shooter subsequently drove

        away. Ex. 2 at 68–71 (Haymon Dep. 67:18–70:10); Ex. 3 at 8.

   **Preliminary Investigation of Plaintiff's Use of Force**

14.     The Metropolitan Police Department's (MPD) Seventh District and two members of

        MPD's SOMB responded to the scene of the shooting.  *See* Defs.' Ex. 3 at 2.

15.     At that time, SOMB responded to all use of force incidents involving an SPO to conduct

        a preliminary administrative investigation.  Ex. 4 at 20, 25–26 (McGunigal Dep. 19:21–

        23, 24:10–25:4).

16.     Senior Sergeant Jeffrey McGunigal and Detective Robbie Saunders from SOMB officials

        conducted a preliminary investigation regarding Plaintiff's use of force on May 19, 2019.

        Defs.' Ex. 3 at 2; Defs.' Ex. 4, McGunigal Dep., at 20 (19:14–19).

17.     SPOs are held to the same use of force standards as members of MPD.  Defs.' Ex. 3 at

        10–11.

18.     MPD considers the discharge of a firearm to be a serious use of force incident.  Defs.' Ex.

        4, McGunigal Dep., at 42 (41:23–25); Defs.' Ex. 6, Declaration of Commander Kimberly

        Dickerson (Dickerson Decl.) ¶ 11.

19.     All SPOs and MPD officers involved in a serious use of force incident, including the

        discharge of a firearm, are subject to an immediate duty status determination that may

require temporary revocation of police powers.  Defs.' Ex. 4, McGunigal Dep., at 14
(13:19–23); Defs.' Ex. 6, Dickerson Decl., ¶ 11.

20.    Under MPD policy, MPD has the sole right, authority, and discretion to determine the
duty status of a member involved in a serious use of force incident.  Defs.' Ex. 6,
Dickerson Decl., ¶ 11; Defs.' Ex. 7, MPD General Order 901.11 Force-Related Duty
Status Determination, at 3.

21.    MPD policy requires the revocation of police powers when necessary to protect the
public.  Defs.' Ex. 8, MPD General Order 120.24 Revocation/Restoration of Police
Powers, at 3.

22.    Once an administrative investigation into an SPO's involvement in a serious use of force
incident begins, the SPO's police powers must be revoked.  Defs.' Ex. 4, McGunigal
Dep., at 14 (13:2–7, 13:20–23).

23.    Upon arriving at the Giant after the shooting, Senior Sergeant McGunigal asked Plaintiff
if he had any certification to possess a firearm.  Defs.' Ex. 4, McGunigal Dep., at 22–23
(21:21–22:5); Defs.' Ex. 9, Defendant Jeffrey McGunigal's Responses and Objections to
Plaintiff's Interrogatories (McGunigal Interrog. Resp.) No. 11 at 9–10.

24.    Plaintiff did not, as of May 19, 2019, and has never had, any certification to carry or own
a firearm in the District of Columbia.  Defs.' Ex. 1 at 11; Defs.' Ex. 2, Haymon Dep. at
60 (59:13–16).

25.    Senior Sergeant McGunigal informed Plaintiff that an investigation would be conducted
regarding the shooting and that Plaintiff's SPO powers would be revoked pending
resolution of the investigation.  *See* Defs.' Ex. 2, Haymon Dep., at 82–84, 87 (81:2–83:1;
86:7–16); Defs.' Ex. 9, McGunigal Interrog. Resp. Nos. 11, 13, at 8–10.

26.     When explaining the preliminary revocation process, Senior Sergeant McGunigal also
        informed Plaintiff that he could continue working for WFPS in a non-SPO capacity while
        the investigation was pending.  *See* Defs.' Ex. 9, McGunigal Interrog. Resp. Nos. 11, 20,
        at 8–9, 12.

27.     In accordance with MPD policy, and after informing Plaintiff of the investigation, Senior
        Sergeant McGunigal completed a duty status form, which Plaintiff signed, that informed
        Plaintiff that his SPO powers were being revoked and that he remained subject to all
        MPD policies and procedures.  *See* Defs.' Ex. 2, Haymon Dep. at 82–84, 87 (81:2–83:1;
        86:7–16); Defs.' Ex. 10, May 19, 2019 Special Police Commission Revocation
        Restoration Form (SPO Duty Status Form), at 2.

28.     When Plaintiff asked about filing paperwork to renew his SPO commission, which was
        set to expire on May 31, 2019, Senior Sergeant McGunigal encouraged Plaintiff to
        submit a renewal application while the administrative investigation was pending.  Defs.'
        Ex. 2, Haymon Dep. at 62, 103 (61:2–21, 102:10–13).

29.     The duty status form that MPD uses for sworn members is called a PD 77, and, because
        of this, the duty status form for SPOs is commonly referred to as a "PD 77" or "77."  *See*
        Defs.' Ex. 4, McGunigal Dep. at 17–18, 41 (16:7–14, 17:2–6, 40:2–7); Defs.' Ex. 9,
        McGunigal Interrog. Resp. Nos. 6, 13, 22 at 6–7, 10, 13.

30.     A change in duty status that revokes an SPO's police powers is a preliminary revocation
        pending an investigation and not a final revocation of the individual's commission.
        Defs.' Ex. 4, McGunigal Dep., at 42 (41:5–10); Defs.' Ex. 6, Dickerson Decl., ¶ 11.

31.     Because Plaintiff was involved in a serious use of force and an administrative
        investigation needed to be completed, Senior Sergeant McGunigal was under a duty to

revoke Plaintiff's police powers.  Ex. 4 at 42 (McGunigal Dep. 41:5–17); Ex. 2 at 129 (Haymon Dep. 128:5–7).

32.  The preliminary revocation of police powers cannot be appealed while an administrative investigation is ongoing.  *See* Defs.' Ex. 4, McGunigal Dep. at 34 (33:1–6); *see also* Defs.' Ex. 6, Dickerson Decl., ¶ 11.

33.  Senior Sergeant McGunigal completed the duty status form revoking Plaintiff's police powers knowing that Plaintiff had been approved for an unarmed SPO commission only and had been in possession of, and discharged, a weapon at Giant on May 19, 2019.  *See* Defs.' Ex. 4, McGunigal Dep., at 43 (42:6–13).

34.  Outside of MPD employees within SOMB, Plaintiff's former attorney, Joseph Scrofano, is the only other person who saw the duty status form revoking Plaintiff's police powers. *See* Defs.' Ex. 2, Haymon Dep. at 123–24 (122:3–123:11); *see also* Defs.' Ex. 4, McGunigal Dep., at 48 (47:2–8).

35.  Plaintiff's employer, WFPS, did not terminate Plaintiff's employment following the preliminary revocation of Plaintiff's SPO powers on May 19, 2019 in case there was an available unarmed post for him.  Defs.' Ex. 2, Haymon Dep., at 107 (106:5–12).

36.  Plaintiff cannot identify any individual who has a lesser opinion of his professional reputation or standing due to the May 19, 2019 preliminary revocation of Plaintiff's SPO powers.  *Id.* at 139–40 (138:21–139:3).

37.  Before May 19, 2019, Plaintiff had never interacted with Senior Sergeant McGunigal.  *Id.* at 61–62 (60:15–61:1); Defs.' Ex. 4, McGunigal Dep., at 13–14 (12:24–13:1).

38.  Senior Sergeant McGunigal only conducted the preliminary investigation for Plaintiff's use of force on May 19, 2019, and was not involved in drafting MPD's final investigative

report.  *See* Defs.' Ex. 4, McGunigal Dep., at 20, 24, 39 (19:20–23, 23:1–3, 38:10–12);

Defs.' Ex. 9, McGunigal Interrog. Resp. No. 14 at 10.

39.     The preliminary investigation entailed gathering all evidence from the scene and

information that could be obtained regarding the incident for SOMB to start an

investigative report; it did not include any summaries, conclusions, or recommendations

about Plaintiff's employment or potential criminal charges, and the PD 77 was not a

charging document that charged Plaintiff with any crime or seek a warrant for his arrest

for a particular crime.  *See* Defs.' Ex. 4, McGunigal Dep., at 20, 23–26, 29, 32, 41

(19:14–25; 22:18–23:4, 24:10–25:4, 28:4–17, 31:14–15: 40:2–13).

40.     Senior Sergeant McGunigal's involvement in the investigation ended with the

preliminary investigation; he was not involved in the subsequent investigation, drafting

the final investigative report, or notifying Plaintiff of the final investigation results.  *See*

Defs.' Ex. 4, McGunigal Dep., at 29–31, 39, 43–44, 47–48 (28:18–29:3, 30:4–13, 38:10–

12, 42:22–43:2, 46:23–47:1); Defs.' Ex. 9, McGunigal Interrog. Resp. No. 14 at 10.

**Final Investigative Report Regarding Plaintiff's Use of Force**

41.     SOMB's Investigative Unit was responsible for handling all cases of criminal and

administrative misconduct of SPOs and Security Officers (SOs) and an SOMB detective

would prepare an investigative report, which would then be reviewed by the Director of

Risk Management and submitted to the Assistant Chief of Police for the Internal Affairs

Bureau (IAB) for approval.  Defs.' Ex. 6, Dickerson Decl., ¶ 5.

42.     After Senior Sergeant McGunigal completed his preliminary investigation, Senior

Sergeant Fulvia Brooks drafted the investigative report for Plaintiff's May 19, 2019 use

of force.  *See* Defs.' Ex. 3 at 2–11; Defs.' Ex. 4, McGunigal Dep. at 30 (29:11–22);.

43.   The final investigative report classified Plaintiff's use of force as justified, with policy violation, and recommended that Plaintiff's SPO commission, which was set to expire May 31, 2019, be indefinitely revoked.  *See* Defs.' Ex. 2, Haymon Dep., at 50, 160 (49:1–4, 159:5–10); Defs.' Ex. 3 at 11.

44.   Under MPD policy, a use of force is classified as justified with policy violation when "a use of force is determined to be justified, but during the course of the incident the subject member violated Department policy."  Defs.' Ex. 11, MPD General Order 901.08 Use of Force Investigations, at 17.

45.   The final investigation report found that Plaintiff's use of force was justified because he discharged his firearm to protect life but that Plaintiff violated MPD policy when he discharged a firearm while performing his duties as an SPO with an unarmed SPO commission and without authorization to possess a firearm.  *See* Defs.' Ex. 3 at 11.

46.   In 2019, the Office of Administrative Hearings (OAH) heard appeals concerning SO certifications, and a designee of MPD's Chief of Police considered appeals related to SPO commissions.  Defs.' Ex. 12, Declaration of Jeffrey McGunigal (McGunigal Decl.), ¶ 4; *see also* Defs.' Ex. 6, Dickerson Decl., ¶¶ 7, 9.

47.   To appeal the denial, suspension, or revocation of an SO certification, an individual was required to file a demand for hearing with OAH within 20 days after service of notice of the action taken.  Defs.' Ex. 12, McGunigal Decl. ¶ 5; *see also* Defs.' Ex. 6, Dickerson Decl. ¶ 7.

48.   To appeal the denial, suspension, or revocation of an SPO commission, an individual was required to write a letter to the Chief of Police within 21 days after service of notice of

the action taken.  Defs.' Ex. 12, McGunigal Decl. ¶ 5; *see also* Defs.' Ex. 6, Dickerson Decl. ¶ 9.

49.     If revocation of an SPO commission was appealed, a designee of the Chief of Police would review the final investigative report, including the justification for the revocation, and make sure proper procedures were followed.  *See* Defs.' Ex. 4, McGunigal Dep., at 44–45 (43:13–44:7).

50.     Senior Sergeant Brooks submitted the final investigative report to Lieutenant Regina Gamble, the lieutenant in charge of SOMB at the time, for approval, and after approving the report, Lieutenant Gamble then submitted the report to Commander (then Inspector) Kimberly Dickerson, Director of Risk Management, who approved the report and sent it to IAB Assistant Chief Wilfredo Manlapaz.  *See* Defs.' Ex. 3 at 2; Defs.' Ex. 6, Dickerson Decl., ¶¶ 5, 12.

51.     On June 10, 2019, Commander Dickerson approved Sergeant Brooks's initial investigative report concerning Plaintiff and then sent it to Assistant Chief Manlapaz, who approved the report and recommendation on June 13, 2019.  *See* Defs.' Ex. 6, Dickerson Decl., ¶ 12.

52.     After the IAB Assistant Chief approved a final investigative report conducted by SOMB recommending the revocation of an SPO commission, the SOMB detective who conducted the initial investigation would be tasked with notifying the individual who would have their SPO commission revoked.  *Id.* ¶ 8.

53.     Upon Assistant Chief Manlapaz's approval, it would have been the responsibility of Sergeant Brooks to notify Plaintiff of the disposition of the investigation.  *Id.* ¶13.

54.     Senior Sergeant McGunigal was not assigned the task of notifying Plaintiff of the

disposition of the investigation regarding his May 19, 2019 use of force.  *See* Defs.' Ex.

4, McGunigal Dep., at 45 (44:16–23).

55.     In 2019, individuals who had been denied an SPO commission or had their SPO

commission revoked had 21 days to submit a written appeal to MPD's Chief of Police

upon receiving notice, and the Chief's designee would then issue a written determination

regarding the appeal, which would be considered a final agency action.  *See* Defs.' Ex. 6,

Dickerson Decl., ¶ 9; Defs.' Ex. 12, McGunigal Decl., ¶ 5.

56.     Plaintiff learned of the results of the administrative investigation through his former

attorney, Joseph Scrofano.  *See* Defs.' Ex. 2, Haymon Dep., at 130 (129:2–8).

57.     Plaintiff did not submit any letter to the Chief of Police appealing either his May 19,

2019 revocation of his SPO powers or the June 2019 revocation.  *See id.* at 94 (93:5–12).

**<u>Plaintiff's Prior Experience with Appeals Process for Denial, Suspension, or Revocation of
SPO Commission</u>**

58.     SOMB performs criminal history checks and criminal history-based eligibility

determinations for all applicants seeking to be licensed by the Department of Licensing

and Consumer Protection (DLCP), formerly part of the Department of Consumer and

Regulatory Affairs (DCRA), as security officers, special police officers, campus special

police officers, security agencies, private detectives, and private detective agencies.  *See*

Defs.' Ex. 13, Declaration of JoAnne Beasley (Beasley Decl.) ¶ 3.

59.     Plaintiff first applied for an SPO commission in the District of Columbia on September 8,

2015.  Defs.' Ex. 2, Haymon Dep., at 30 (29:8–14); Defs.' Ex. 14, Denial of 2015 SPO

Application and Appeal of Denial for Guy Haymon, at 2, 9.

60.     Plaintiff's 2015 SPO application was denied because Plaintiff wrote "none" for his arrest history on his application, despite his prior record of several arrests.  *See* Defs.' Ex. 14 at 2–9.

61.     Plaintiff received notification of the denial of his 2015 SPO application on December 22, 2015, and the denial informed Plaintiff that he could appeal the denial in writing within 21 days of receipt to the Chief of Police.  *Id.* at 6–7; *see also* Defs.' Ex. 2 at 36 (Haymon Dep. 35:3–7).

62.     After receiving the 2015 notice of the denial, Plaintiff wrote a letter of appeal to the Chief of Police within 21 days.  Defs.' Ex. 14 at 7–8; *see also* Defs.' Ex. 2, Haymon Dep., at 38 (37:19–22).

63.     A designee of the Chief of Police responded to Plaintiff's letter and denied his appeal on February 3, 2016.  *See* Defs.' Ex. 14 at 9.

64.     Subsequently, Plaintiff applied for and obtained an unarmed SPO commission in 2017.  *See* Defs.' Ex. 15, July 31, 2017 SPO Application Approval Form for Guy Haymon.

**Plaintiff's Employment History Since May 2019**

65.     Individuals who have had an SPO commission revoked are not prevented from re-applying for an SPO commission; nor does a revocation serve to automatically disqualify an applicant from obtaining a new SPO commission.  *See* Def.'s Ex. 13, Beasley Decl., ¶ 4.

66.     SOMB has no record of Plaintiff applying for a new SPO commission since MPD revoked his SPO commission, which had already expired effective May 31, 2019, in June 2019.  *Id.* ¶ 5; *see also* Defs.' Ex. 2, Haymon Dep., at 164–65 (163:7–164:14).

67.   SPOs must apply to renew their SPO commissions annually and Plaintiff did not apply for a new SPO commission with the District in 2020, 2021, or 2022. *See* Defs.' Ex. 2, Haymon Dep., at 164–65 (163:22–164:14).

68.   The State of Maryland also grants SPO commissions to private individuals; Plaintiff has not applied to obtain an SPO commission in the state of Maryland. *Id.* at 112 (111:12–19).

69.   If Plaintiff were to apply to be an SPO in Maryland, Plaintiff would not also need a District of Columbia SPO commission and the state of Maryland does not contact MPD's SOMB about Maryland SPO applicants. *See* Defs.' Ex. 4, McGunigal Dep. at 47 (46:3–11).

70.   The Federal government also employs its own SPOs that work in the District of Columbia who do not need to possess an SPO commission issued by the District; the federal government would not seek information from MPD's SOMB about a federal SPO applicant. Defs.' Ex. 4, McGunigal Dep., at 49–50 (48:12–49:18).

71.   Plaintiff began providing security for bars in the District in May 2019. *See* Defs.' Ex. 2, Haymon Dep., at 16, 113–116, 148–149 (15:3–22, 112:19–115:14, 147:14–148:15).

72.   After the May 2019, Plaintiff has not applied to be certified as an SO in the District of Columbia. *See* Defs.' Ex. 2, Haymon Dep., at 112 (111:8–11).

73.   Nevertheless, Plaintiff currently works for Washington Field Protective Services full-time as a security officer. *Id.* at 13–14, 110, 153–154 (12:11–13:13, 109:14–18, 152:12–153:12).

74.   At the time of the May 19, 2019 preliminary revocation of Plaintiff's SPO police powers, Plaintiff made $14/hour working as an SPO for WFPS, and Plaintiff currently makes

$18/hour working as an SO for WFPS.  *Id.* at 27–28, 104–05, 153–54 (26:13–27:2; 103:15–104:20, 11:152:12–153:1).

**Plaintiff Failed to Provide the District Notice Under § 12–309 Before Filing Suit**

75.    Under D.C. Code § 12-309, the District's Office of Risk Management (ORM) Tort Liability Division receives, processes, and investigates potential tort claims against the District.  *See* Defs.' Ex. 16, Declaration of Lana Craven (Craven Decl.) ¶ 1.

76.    When the ORM Tort Liability Division receives claims notices, either directly or from the Mayor's Office, it records the receipt of said claims notices in its claims management system, called the "Risk Management System." *Id.* ¶ 2.

77.    Lana Craven, the Program Analyst for the ORM Tort Liability Division, conducted a diligent search of the records placed in ORM's Risk Management System, which entailed a search for claims filed by or for Guy Haymon sought any claims described in the Complaint docketed in No. 2021 CA 000560 B in D.C. Superior Court.  Craven Decl. ¶¶ 4–5.

78.    The result of this search has revealed that the Tort Liability Division of the District of Columbia Office of Risk Management has received no claims notice(s) from the following named Plaintiff: Guy Haymon.  Craven Decl. ¶ 6.

Date:   December 11, 2023                    Respectfully submitted,

                                             BRIAN L. SCHWALB
                                             Attorney General for the District of Columbia

                                             STEPHANIE E. LITOS
                                             Deputy Attorney General
                                             Civil Litigation Division

                                             */s/ Steven N. Rubenstein*
                                             STEVEN N. RUBENSTEIN [1013094]
                                             Acting Chief, Civil Litigation Division Section II

*/s/ Rachel B. Gale*
RACHEL B. GALE [90003972]
Assistant Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7458
rachel.gale@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GUY HAYMON,

          *Plaintiff*,

    v.

DISTRICT OF COLUMBIA, *et al.*

          *Defendants*.

Civil Action No. 1:21-cv-00886 (RDM)

**ORDER**

Upon consideration of Defendants' Motion for Summary Judgment, the memorandum of points and authorities in support thereof, any opposition and reply thereto, and the entire record, it is this _____ day of _____ 2024, hereby

**ORDERED** that Defendants' Motion is **GRANTED**; and it is further

**ORDERED** that **JUDGMENT** is entered in Defendants' favor; and it is further

**ORDERED** that the Complaint is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

_____
Randolph D. Moss
United States District Judge

CC:    John F. Pressley, Esq.
        *Counsel for Plaintiff*

        Steven N. Rubenstein
        Rachel B. Gale
        Assistant Attorneys General
        *Counsel for Defendants*